## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOMINIQUE CAVALIER, NINA HARRIS, and GERALD HARRIS, individually and on behalf of all those similarly situated,<br><br>              Plaintiff,<br><br>   v.<br><br>DEEPINTENT TECHNOLOGIES, INC.<br><br>              Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Dominique Cavalier, Nina Harris, and Gerald Harris ("Plaintiffs") individually and on behalf of all others similarly situated, bring this action against DeepIntent Technologies, Inc. ("DeepIntent"). Plaintiffs' allegations against DeepIntent are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## I.    <u>NATURE OF THE ACTION</u>

1.    This class action lawsuit arises from Defendant DeepIntent's extensive web tracking of millions of Americans' healthcare-related online behaviors without those users' knowledge or consent.

2.    DeepIntent calls itself "The Most Powerful Healthcare Advertising Platform." Its main product offering is its "demand-side platform" (DSP), which is utilized by healthcare-focused advertisers, including major pharmaceutical companies, which seek to purchase advertising space on prominent health-related websites frequented by millions of Americans each year.

1

3.      DeepIntent's entire business model as a DSP is built on the unlawful interception and collection of massive amounts of sensitive, personally identifiable health information of consumers and patients of numerous healthcare industry companies across the country.

4.      As detailed below, by surreptitiously embedding tracking software on numerous health-related websites without users' knowledge or consent, DeepIntent tags each user with a permanent identifying number, allowing DeepIntent to monitor that individual across the internet (and beyond).  Through this identifier and similar tracking technologies described herein, DeepIntent collects users' specific web activity – including websites and specific webpages visited, ads clicked, and even the text of search queries entered by the user – allowing DeepIntent to easily ascertain information regarding users' health conditions, medical treatments, and other similarly sensitive topics.

5.      DeepIntent has accomplished this even though (and, indeed, because) virtually no consumer has ever heard of it, no consumer has ever actually consented to any of its activities in question, and no consumer has a meaningful ability to opt-out of its tracking.

6.      Plaintiffs therefore bring this action on behalf of themselves, and others similarly situated to enforce their fundamental Constitutional, common law, and statutory rights to privacy, which DeepIntent has violated and continues to violate.

## II.      <u>**THE PARTIES**</u>

7.      Plaintiff Dominique Cavalier resides in Ontario, California.  Plaintiff Cavalier was in California when Plaintiff Cavalier accessed healthline.com and everydayhealth.com to research a personal health condition.   Healthline.com and everydayhealth.com are health-related websites on which DeepIntent has integrated its tracking technologies (as described herein), and DeepIntent

2

tracked Plaintiff Cavalier's activity on those websites and subsequent activity on other websites and apps.

8.      Plaintiff Nina Harris resides in Camarillo, California.  Plaintiff Harris was in California when she accessed healthline.com and reachmd.com to research a personal health condition.  Healthline.com and reachmd.com are health-related websites on which DeepIntent has integrated its tracking technologies (as described herein), and DeepIntent tracked her activity on those websites and subsequent activity on other websites and apps.

9.      Plaintiff Gerald Harris resides in Camarillo, California.  Plaintiff Harris was in California when he accessed ozempic.com to research a personal health condition.  Ozempic.com is a health-related website on which DeepIntent has integrated its tracking technologies (as described herein), and DeepIntent tracked his activity on that website and subsequent activity on other websites and apps.

10.     Defendant DeepIntent is a Delaware corporation headquartered in New York, New York.  DeepIntent is wholly owned by Propel Media, Inc., a holding company incorporated in Delaware and headquartered in Wyoming.

## III.    <u>JURISDICTION AND VENUE</u>

11.     This Court has subject matter jurisdiction over the federal claim in this action pursuant to 28 U.S.C. § 1331.

12.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendant.

13.     This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

14.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in New York and a substantial part of Defendants' conduct giving rise to this action took place in New York.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) Defendant DeepIntent resides in this District, (ii) Defendant DeepIntent is subject to the Court's jurisdiction with respect to this action, and (iii) a substantial part of the events giving rise to the claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Overview of Digital Advertising Technology

16.     DeepIntent's primary purpose for surreptitiously intercepting and collecting consumers' personal information is to profit by participating on behalf of its advertiser clients in "Real-Time Bidding" (RTB) auctions.

17.     "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[1]

18.     "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily

---

[1] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

4

work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[2]  And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[3]

19.     In other words, SSPs provide user information to advertisers that might be interested in those users; DSPs (like DeepIntent) are platforms for advertisers, helping them select which users to target with advertisements; and the Advertising Exchange effectively serves as a middleman, functioning as a digital marketplace where advertisers, website/app publishers, DSPs, and SSPs can participate in bidding on advertising inventory from various publishers using RTB.

20.     The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.  Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. [4]

21.     When a user opens a website (or an app), that website (or app) publisher's SSP sends out a "bid request" that contains (i) information about the user, including device type and IP address,[5] which also gives geolocation information—locating a device at the city level with

---

[2] Geoghegan, *supra*.

[3] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[4] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

[5] An IP address is a is a unique numerical label assigned to each device that connects to the internet. (e.g., 123.456.789.123). The first two sets of numbers indicate what network the device is on (e.g., 123.456), and the second two sets of numbers identify the specific device (e.g., 789.123).

extremely high accuracy and often providing location information down to the user's ZIP code; (ii) information about the context of the site visit, including the webpage URL (i.e., web address); and (iii) any restrictions imposed on advertisements by the website.  This information is known as "bidstream data."

22.     The bid request is sent to the Advertising Exchange, which then broadcasts the bid request to multiple DSPs.  Each DSP will evaluate the bid request, determining – based on guidelines and instructions from the advertisers with which they are partnered – whether the website user matches any of their target audience segments.

23.     If the user is a match for an advertiser's criteria, the DSP will instantly calculate a bid (e.g., $1.00 CPM, or "cost per mille")[6] for a particular ad to be displayed.

24.     The Advertising Exchange then holds the auction: all DSP bids are collected, and the highest bidder wins (i.e. buys) the right to display its advertisement on the webpage.

25.     The RTB process occurs in a matter of milliseconds entirely outside of the website user's view.  From the user's perspective, the website finishes loading, and the ad slot on the website displays an ad.

26.     Facilitating this real-time bidding process means DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers.  Indeed, because the main function of a DSP is to buy digital ad space as efficiently and effectively as possible on behalf of advertisers, DSPs will seek to obtain as much detailed data on a user before calculating and submitting a bid for an advertisement.  If a user matches the advertiser's ideal customer profile, the DSP may bid higher for an ad on behalf of a particular advertiser.  If the user

---

[6] "Cost per mille" is one of the most common pricing models in digital advertising. In a CPM model, an advertiser pays a certain amount per 1,000 "impressions" (i.e. each ad being served). Thus, in this example, the advertiser bid $1 for every 1,000 times its ad is shown.

is a poor fit for a particular advertisement, the DSP may bid little or nothing during the auction. For example, if a pharmaceutical brand is running an online ad campaign for a prostate cancer drug, it would make little sense to show an ad for that drug to a female user.

27.    Thus, DSPs – including DeepIntent – do not rely solely on bidstream data in determining whether (and how much) to bid for a particular advertising impression.  Rather, DSPs typically seek to enrich the bidstream data with data from other sources of information, including additional information about the user collected by the DSP itself as well as third-party data on the user available to the DSP through partnerships with data brokers and "Data Management Platforms" (DMPs):

> The economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.[7]

28.    For example, bidstream data typically includes a "device ID" – i.e., a unique identifier assigned to a user's computer or smartphone – which the DSP will try to match against its own data.  If there is a match to that device ID, the DSP then "knows" that it has seen a particular user on a website or on other websites across the web with which the DSP is also partnered.  For example, a DSP can recognize a website user who searched for a specific healthcare treatment last week on another publisher's site with which the DSP is also partnered.

---

[7] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

29.     In addition, DSPs – including DeepIntent – will also use data obtained from third-party data brokers and DMPs to pull in even more detailed information on the user, including demographic, behavioral, or purchase-intent information:



30.     Through this extensive data collection process, DSPs (like DeepIntent) can determine with extreme precision who a user is – i.e., the user's age, gender, location – along with their likely interests, preferences, and other characteristics.  For example, a DSP may identify a specific user on a health-related website as a "35-44 year old male in Southern California with an active lifestyle who frequently shops for diabetes testing supplies."

31.     Even if a DSP does not win the auction, "the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction.  This information can be added to existing dossiers DSPs have on a user."[8]  This greatly diminishes the ability of users to control their personal information.

32.     In addition, advertisers want to know which audiences are engaging with or making purchases based on their advertisements.  Thus, DSPs also track detailed user interactions across

---

[8] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

websites and apps, then feed that data back into algorithms to optimize future bidding and targeting.

33.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b)    "send[ing] sensitive data across geographic borders."

(c)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder—actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[9]

34.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[10]

---

[9] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[10] Geoghegan, *supra*.

35.    For these reasons, some have characterized RTB as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive users' personal information:[11]



36.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and by statutes like the California Invasion of Privacy Act ("CIPA"). *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

---

[11] IRISH COUNCIL FOR CIVIL LIBERTIES, THE BIGGEST DATA BREACH EVER RECORDED (May 16, 2022), https://www.iccl.ie/wp-content/uploads/2022/05/Mass-data-breach-of-Europe-and-US-data-1.pdf

**B.    DeepIntent Intercepts Users' Communications With Websites Via Cookie Syncing**

37.    Both the capabilities of DSPs and the reasons that DeepIntent installs its tracking technologies on websites (to intercept as much user information as possible to provide to advertisers in real-time bidding) are clear.    The method through which DeepIntent shares information with other services to offer the most complete user profiles up for sale occurs through a process known as "cookie syncing."

38.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[12]

39.    Cookie syncing (or "CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3)*.
>
> …

---

[12] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[13]



40.    Through this process, DeepIntent is not only able to resolve user identities (*e.g.*, learning that the person who website 1 knew as "userABC" and website 2 knew as "user123" are the same person), but it can also "track a user to a much larger number of websites," even those who "do not have any collaboration with" DeepIntent.[14]

---

[13] Papadopoulos, *supra*, at 1433 (emphases added).

[14] Papadopoulos, *supra*, at 1434.

41.     Indeed, "CSync may re-identify web users even after they delete their cookies."[15] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[16]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[17]

42.     Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[18]

43.     Cookie syncing is precisely what is happening here.  When DeepIntent's tracking technologies are installed on users' browsers, DeepIntent syncs their unique user identifier(s) with other identifiers assigned to users by third parties on the websites.  The result of this process is not only that a single user is identified as one person by these multiple parties, but that those parties share all the information about that user with one another (because the cookie is linked to a specific individual user).  This prevents users from being anonymous when they visit websites.

44.     As noted above, DeepIntent's main product offering is its healthcare-focused DSP. As a DSP, DeepIntent plays a central role in enabling and profiting from the RTB ecosystem.  It does so through invasive and pervasive surveillance, profiling, and targeting of users, without their consent or knowledge.

---

[15] *Id*.

[16] *See id*.

[17] *Id*.

[18] *Id.* at 1441.

45.     DeepIntent's primary method for surveilling and intercepting website/app user data is through web-based tracking technologies, such as cookies, pixels and web beacons ("Tracking Tools"), which are integrated into health-related websites that have agreed to host such technologies.

46.     Cookies are small text files that can be used to store information on a user's browser which can later be communicated to a server.

47.     CDIUSER is a cookie that DeepIntent surreptitiously sets in a user's browser when they visit a health-related website that has partnered with DeepIntent.

48.     CDIUSER functions by providing a unique identifier for each user, which allows DeepIntent to recognize the same browser or device across different webpage visits and across partner websites.

49.     DeepIntent's tracking software automatically checks to determine if that user already has a CDIUSER identifier stored in their browser.  If so, DeepIntent will recognize the user as one who has previously been to the website; if not, DeepIntent will generate a new CDIUSER identifier for the user.

50.     CDIUSER is a "persistent" identifier, in that it remains stored on the user's device (computer, phone, tablet, etc.) long after the user leaves a website.  In fact, DeepIntent's CDIUSER identifier follows users across the web for more than a year.

51.     In effect, CDIUSER is the "glue" that allows DeepIntent to link users' browsing history, location data, and other personal information into a unified advertising profile.

52.    The below screenshots from everydayhealth.com and breastcancer.org – websites that have integrated DeepIntent's Tracking Tools – demonstrate how the same CDIUSER identifier is retained across both websites for the same actual user:

53.     As reflected in these screenshots, through the CDIUSER identifier, DeepIntent and any of its interested advertiser clients would know that the same individual is interested in both topics on Everydayhealth.com as well as BreastCancer.org.

54.     The screenshot below from everydayhealth.com shows DeepIntent's pixel (px.deepintent.com) working in conjunction with DeepIntent's CDIUSER persistent identifier:



55.     As demonstrated in the screenshot, through these Tracking Tools, DeepIntent is able to intercept the precise URL of each webpage visited by any user, as well as the exact search query input by that user.  As a result, DeepIntent (and its advertiser clients) has learned that the actual user whose information is reflected above searched for "Care for HIV" on everydayhealth.com.

56.     The below screenshots from Iluyma.com (a plaque psoriasis drug) shows DeepIntent's web beacon (beacon.deepintent.com) working in conjunction with DeepIntent's CDIUSER persistent identifier:



57.     The above screenshots also reflect the insertion of DeepIntent's "CDIPARTNERS" cookie.  CDIPARTNERS is used by DeepIntent to manage integrations with its partners, such as data brokers, SSPs, or website/app publishers, through cookie syncing.

58.     When DeepIntent integrates with an external partner (such as a website publisher's SSP), that SSP may have its own identifier for a specific user (i.e. different than the CDIUSER identifier that DeepIntent has assigned to the user).  CDIPARTNERS works as a "bridge" between that external ID and DeepIntent's own CDIUSER identifier, ensuring that DeepIntent knows that the SSP's ID for that user (e.g., ABC123) is the same as the CDIUSER ID for the same user (e.g., DEF456).

59.     In addition, when a user visits a DeepIntent-integrated website, DeepIntent also receives the user's IP address, through which DeepIntent can determine the user's state, city, and

zip code.  This allows DeepIntent's advertiser clients to target specific households, businesses, and even individuals with ads that are relevant to their interests.

60.    DeepIntent's Tracking Technologies are deployed behind the scenes, outside of the view (and knowledge) of consumers.  Indeed, the full scope and extent of DeepIntent's tracking and compiling of users' personal information resides with DeepIntent itself, is not fully disclosed by DeepIntent, and therefore must be fully determined through discovery.  However, it is believed that DeepIntent tracks users' activity on scores of healthcare-related websites, intercepting and collecting searches and viewing of content by a massive number of users.  At a minimum, DeepIntent's Tracking Tools have been integrated into the following health-related websites which are viewed by millions of Americans each year:

- Everyday Health Group [https://everydayhealth.com]

- HealthLine [https://healthline.com]

- Ozempic website [https://ozempic.com] (Novo Nordisk)

- Zepbound website [https://zepbound.lilly.com] (Eli Lilly)

- Genteal Tears website [https://gentealtears.myalcon.com/] (Alcon, Inc.)

- Ilumiya website [https://ilumiya.com] (Sun Pharma)

- BreastCancer.org

- Reachmd.com

- Onetouch.com (diabetes care)

61.    Through its expansive network of partner websites, DeepIntent aggregates intercepted user data across multiple sites and sessions to build a comprehensive behavior profile on the user, focusing on healthcare interests and likely medical conditions.

62.    DeepIntent's tracking of users' activity goes beyond website activity.  For example, through DeepIntent's partnership with LG Ad Solutions, DeepIntent collects information about users' internet-connected television viewership habits and data (for example, if a user watches health-related content on a streaming platform through the user's television.)

63.    DeepIntent also supplements the data it has collected through its own Tracking Tools with data from multiple third-party data providers, which aggregate information from other websites (i.e., those outside the DeepIntent network), apps, public records, or consumer surveys. This information can include a user's demographic information (*e.g.*, age range, gender, household income, education level), lifestyle and interest data (*e.g.*, fitness habits, diet preferences, health concerns inferred from browsing outside of DeepIntent's network), and location-based signals (*e.g.*, ZIP-code level health trends or geolocation patterns).

64.    Ultimately, DeepIntent compiles all of this information into what it describes as an "industry-leading identity graph."  An identity graph is a database or framework that links together all the different identifiers associated with a single person – persistent identifiers (like CDIUSER), mobile ad IDs ("MAIDs"),[19] CTV IDs (*i.e.*, smart TV identifiers), IP addresses, device characteristics, and contextual and demographic data – unifying them into one profile for targeting, measurement, and personalization.

65.    Armed with a massive amount of information about the user, DeepIntent then groups the user into hundreds or thousands of specific cohorts, or "audiences."  These audiences can range from hyper-specific segments of users (such as "21-30 year old males with asthma who

---

[19] A "MAID" is a unique identifier that a smartphone's operating system assigns to the device for advertising and tracking purposes.  MAIDs in the Android mobile operating system are referred to as AAIDs (Android Advertising IDs), while the Apple iOS mobile operating system's MAIDs use the initialism IDFA (ID for Advertisers)

reside in California and have an active lifestyle") to larger, more general groups of people (such as "people with asthma").

66.     DeepIntent then sells access to these audiences to healthcare-focused advertisers and ad agencies through its DSP.  In other words, DepeIntent directly profits from its extensive interception, collection, and aggregation of information – including sensitive health-related information – on consumers.

67.     Going even further, DeepIntent touts its ability to track "conversions," or instances in which the same person who viewed an advertisement went on to make the purchase suggested by the advertisement or otherwise took steps that would indicate having been influenced by the advertisement.  In particular, DeepIntent explicitly advertises its ability to measure "script lift," *i.e.*, whether an audience for a particular pharmaceutical drug advertisement shows higher prescription fill rates than a control group.

68.     When a user visits a site and an ad for a pharmaceutical product is shown, DeepIntent (via cookies and/or web beacons/pixels) logs an impression tied to the user's assigned identifier (*e.g.*, CDIUSER).  DeepIntent then attempts to probabilistically match that ad exposure to prescription fill events, by using data from third-party data aggregators that measure de-identified pharmacy claims data and electronic health records.  For example, DeepIntent – through its own Tracking Tools – can determine that households in a particular zip code (including the user's zip code) were served ads for the pharmaceutical drug, and then use pharmacy claims data to determine that prescriptions for that drug increased in that particular zip code.

69.     Through this process, DeepIntent can determine – with a high degree of probability – that a specific user filled a prescription for that advertised pharmaceutical drug, even if the user never clicked on/engaged with the ad or otherwise made reference to that drug purchase online.

Of course, that probability increases even further if DeepIntent has, through its Tracking Tools, intercepted communications between the user and the website relating to that pharmaceutical drug (*e.g.*, clicking the ad for the drug or searching for the drug on a DeepIntent-partnered website).

### C.  DeepIntent Intercepted Plaintiffs' Communications With Multiple Websites

70.    As noted above, healthline.com is one of many websites that has integrated DeepIntent's Tracking Tools, including DeepIntent's CDIUSER cookie, pixel, and web beacons.

71.    Healthline.com is a consumer health information website that publishes articles, guides, and reference materials on a wide range of health topics, including medical conditions and treatments.  With an estimated 90 million visits per month, healthline.com is one of the most-visited health websites in the world.

72.    Plaintiff Cavalier and Plaintiff Nina Harris have visited healthline.com to obtain information about personal health conditions.

73.    Each time Plaintiff Cavalier and Plaintiff Nina Harris visited healthline.com, DeepIntent's Tracking Tools intercepted virtually every interaction between them, on the one hand, and the website, on the other hand, including URLs, the text of searches and queries on specific topics, and ad clicks, in addition to collecting information regarding the device types, browsers, IP addresses, and other technical identifiers associated with those Plaintiffs.

74.    As noted above, everydayhealth.com is another website that has integrated DeepIntent's Tracking Tools, including DeepIntent's CDIUSER cookie, pixel, and web beacons.

75.    Everydayhealth.com is a popular health and wellness information website that provides medically reviewed content on a wide range of topics, including medical conditions, treatments, and medical news.

76.     Plaintiff Cavalier has visited everydayhealth.com to obtain information about a personal health condition.

77.     Each time Plaintiff Cavalier visited everydayhealth.com, DeepIntent's Tracking Tools intercepted virtually every interaction between Plaintiff Cavalier and the website, including URLs, the text of searches and queries on specific topics, and ad clicks, in addition to collecting information regarding the device type, browser, IP address, and other technical identifiers associated with Plaintiff Cavalier.

78.     As noted above, reachmd.com is another website that has integrated DeepIntent's Tracking Tools, including DeepIntent's CDIUSER cookie, pixel, and web beacons.

79.     Reachmd.com is a website that provides medical news, expert commentary, and clinical updates across a wide range of medical specialties.

80.     Plaintiff Nina Harris has visited reachmd.com to obtain information about a personal health condition.

81.     Each time Plaintiff Nina Harris visited reachmd.com, DeepIntent's Tracking Tools intercepted virtually every interaction between Plaintiff Nina Harris and the website, including URLs, the text of searches and queries on specific topics, and ad clicks, in addition to collecting information regarding the device type, browser, IP address, and other technical identifiers associated with Plaintiff Nina Harris.

82.     As noted above, ozempic.com is another website that has integrated DeepIntent's Tracking Tools, including DeepIntent's CDIUSER cookie, pixel, and web beacons.

83.     Ozempic.com is the official website for Ozempic®, a prescription medication from the pharmaceutical company Novo Nordisk.  Ozempic® is a drug used to manage Type 2 diabetes and is also used for chronic weight management in adults with obesity or overweight.

84.    Plaintiff Gerald Harris has visited ozempic.com to obtain information regarding Ozempic®, including prescribing information and medication guides.

85.    Each time Plaintiff Gerald Harris visited ozempic.com, DeepIntent's Tracking Tools intercepted virtually every interaction between Plaintiff Gerald Harris and the website, including URLs, the text of searches and queries on specific topics, and ad clicks, in addition to collecting information regarding the device type, browser, IP address, and other technical identifiers associated with Plaintiff Gerald Harris.

86.    Plaintiffs did not consent or agree to DeepIntent's interception of their communications with these websites, which included sensitive, personally identifiable health-related information.  In fact, Plaintiffs were entirely unaware of DeepIntent's existence or its use of its Tracking Tools when Plaintiffs visited these websites.

### D.    Health-Related Data Is Particularly Sensitive

87.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society.

88.    Individuals have a particular privacy interest in their health data not only because of the social stigma associated with certain health conditions, but also because of the direct financial implications which may accompany an insurance company learning information about one's health that the individual may not have intended to share.

89.    As explained above, DeepIntent's Tracking Tools, which are integrated into a significant number of popular healthcare-related websites, allow DeepIntent to construct a

longitudinal record of a person's online activity as it pertains to health, which can include that user's private health conditions and medical treatments.

90.      DeepIntent claims to only collect de-identified data on users.    However, DeepIntent's "identity graph" can result in individuals being re-identified, given that the entire purpose of its identity graph is to cohesively link multiple identifiers (*e.g.*, persistent identifiers, IP addresses, MAIDs, CTV IDs) together so that a particular individual can be associated with that particular individual's sensitive health data.  When combined with unique health-related behaviors, an "anonymous" profile can become probabilistically linked to a real person.  This is especially true given that certain medical conditions are extremely rare.

91.      Thus, even if a user with such a condition were placed in a larger "audience" by DeepIntent, it would not be challenging to single that person out in the audience, especially with the wealth of other data collected by DeepIntent on that person.  For example, a user with a rare form of cancer (gleaned from that user's browsing history and the text of their online search queries), in a specific location (based on IP address data), in a specific age range (based on data obtained by DeepIntent from a third-party data broker) would be easy to identify, despite DeepIntent's claims of "de-identification."

92.      Indeed, in a 2013 study conducted by MIT, in a dataset of 1.1 million people, researchers were able to identify individuals with 95% certainty using only 4 points of time-stamped location data, and with 100% certainty using 11 points of time-stamped location data.[20] This study clearly demonstrates the ease with which ostensibly pseudonymized data, like that surreptitiously collected by DeepIntent, can be used to identify and target a specific individual.

---

[20] *See* "Unique in the Crowd: The privacy bounds of human mobility," Scientific Reports, published March 25, 2013 (available at https://www.nature.com/articles/srep01376).

93.     Moreover, DeepIntent's practice of measuring ad conversions in the healthcare context raises additional privacy concerns.  Most patients would have no idea that seeing an ad for a prescription drug could later be connected to whether they filled a prescription for that drug. Indeed, making certain healthcare-related purchases is the type of information that consumers would reasonably expect to remain private and not form the basis of interest-based advertising.

**E.      Plaintiffs and the Classes Did Not Consent to DeepIntent's Interception and Collection of their Data**

94.     Despite the widespread integration of DeepIntent's Tracking Tools on scores of health-related websites and the staggering amount of data that DeepIntent intercepts and collects on individual consumers – including sensitive health-related information – at no point does DeepIntent attempt to identify itself to end users on those websites.

95.     DeepIntent makes no effort to obtain consent from consumers whose data it gathers, including Plaintiffs and Class Members (defined below).  At no point during its process of collecting or processing personal information, the compiling of user profiles/audiences, or selling services based on that personal information, does DeepIntent ever directly ask individuals for their consent.

96.     Nor have Plaintiffs and Class Members manifested any form of consent even indirectly.  DeepIntent publishes a so-called "Platform Privacy Policy" on its website,[21] but this policy is not reasonably directed to Plaintiffs and Class Members, all of whom lack any direct relationship with DeepIntent and have no reasonable insight into DeepIntent's data collection and data exploitation practices or how they may or may not be subject to such practices.  Plaintiffs have never agreed to any such policy.

---

[21] *See* DeepIntent "Platform Privacy Policy," available at https://start.deepintent.com/platform-privacy-policy (last accessed Oct. 26, 2025).

97.    In fact, DeepIntent does not even require its connected publishers (i.e., those that have installed DeepIntent's various Tracking Tools) to inform consumers that they are utilizing DeepIntent's Tracking Tools.  Therefore, there is no reasonable basis upon which Plaintiffs and Class Members would be aware of DeepIntent's privacy policies.  Plaintiffs and Class Members are not legally subject to or governed by DeepIntent's published privacy policies.

98.    As its privacy policy demonstrates, DeepIntent relies heavily on permissions purportedly provided by users on third-party websites (i.e., those websites which host DeepIntent's Tracking Tools) as the supposed legal basis for its data collection on individuals.  For example, DeepIntent discloses in its Privacy Policy that it may collect "GPS-level location information and precise geolocation" from website and app publishers, but that those publishers "are responsible for obtaining [users'] permission to do so."  However, consumers visiting health-related websites that have integrated DeepIntent's Tracking Tools do not require consumers to view (through a link or otherwise), let alone agree to, DeepIntent's privacy policies.  In fact, consumers are generally entirely unaware of the existence or function of DeepIntent itself.

99.    Plaintiffs and Class Members cannot reasonably foresee all the ways in which DeepIntent may use the detailed profiles it is compiling on them.  Plaintiffs and Class Members have no way of knowing the specific third parties to which DeepIntent will provide their healthcare-related information, or what those third parties will do with that information.  Plaintiffs and Class Members thus cannot provide knowing and informed consent to DeepIntent's dissemination of their personal information.

100.    Neither DeepIntent's so-called privacy policies nor the policies of third-party publishers could provide any reasonable basis for Plaintiffs and Class Members to have consented to DeepIntent's data collection, compiling of digital profiles, and other data exploitation practices,

let alone to have waived their privacy rights, including to be free from DeepIntent's pervasive surveillance of them.

## V.    CLASS ALLEGATIONS

101.    **Class Definition**: Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class:

> All persons in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was collected and used by DeepIntent.

102.    **California Subclass**: Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All California residents whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was collected and used by DeepIntent.

103.    The Class and the California Subclass shall be collectively referred to as the "Classes," and Members of the Class and California Subclass shall be collectively referred to as "Class Members," unless it is necessary to differentiate them.

104.    Excluded from the Classes are Defendant; any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer, director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

105.    Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

106.    This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23.

107.    **Numerosity**: Each Class is so numerous that joinder of all members is impracticable.  Upon information and belief, Class Members number in the millions.

108.    **Commonality**: There are questions of law or fact common to the Classes.  These questions include, but are not limited to, the following:

    a.    Whether DeepIntent's acts and practices violated California's Constitution, Art. 1, § 1,

    b.    Whether DeepIntent's acts and practices violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal. Code §§ 630, *et seq.*;

    c.    Whether DeepIntent's acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*;

    d.    Whether DeepIntent sought or obtained prior consent from Plaintiffs and Class Members;

    e.    Whether DeepIntent was unjustly enriched as a result of its violations of Plaintiffs' and Class Members' privacy rights; and

    f.    Whether declaratory relief should be granted.

109.    **Typicality**: Plaintiffs' claims are typical of the claims of the Classes.  Plaintiffs and the Class Members did not consent to DeepIntent's interception, collection, analysis, and sale or their personal information, which acts form the basis for this suit.

110.    **Adequacy**: Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes.  Plaintiffs are represented by attorneys with

experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

111.    **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## VI.    CAUSES OF ACTION

### COUNT I
### Violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*
### (on behalf of the California Subclass)

112.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

113.    Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

### A.    Wiretapping – Cal. Penal Code § 631

114.    CIPA § 631 provides (in part) that it shall be unlawful for "[a]ny person" who, "by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or

otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit[.]"

115.    DeepIntent is a "person" within the meaning of CIPA § 631.

116.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, DeepIntent's deliberate and purposeful scheme that facilitated its interceptions falls under the broad statutory category of "any other manner":

    a.    DeepIntent's Tracking Tools and/or other similar computer codes and programs designed to intercept, collect, transmit, and track consumers' private information;

    b.    Plaintiffs' and California Subclass Members' browsers;

    c.    Plaintiffs' and California Subclass Members' computing and mobile devices; and

    d.    The plan DeepIntent carried out to effectuate its tracking and interception of consumers' private information and communications while browsing the Internet.

117.    DeepIntent's Tracking Tools and/or other similar computer codes and programs contemporaneously and surreptitiously intercepted the contents of Plaintiffs' and California Subclass Members' electronic communications with websites while those communications were in transit and secretly sent them to DeepIntent, as described at paragraphs 45-61 above.  The contents of Plaintiffs' and the California Subclass Members' communications intercepted by DeepIntent includes, among other things, the precise URL of each article and webpage visited, as well as the exact search queries inputted on those websites.

118.    DeepIntent's actions were designed to learn or attempt to learn the meaning of the contents of Plaintiffs' and the California Subclass Members' communications exchanged with websites they visited.

119.    DeepIntent did not have the prior consent of all parties to learn the contents of or record the communications at issue, as Plaintiffs and California Subclass Members did not provide express prior consent to DeepIntent's interception of their communications with websites.

120.    The wiretapping of Plaintiffs and California Subclass Members occurred in California, where Plaintiffs and California Subclass Members accessed the websites, where DeepIntent's cookies and web beacons/pixels were loaded on Plaintiffs' and California Subclass Members' browsers, and where DeepIntent routed Plaintiffs' and California Subclass Members' electronic communications to DeepIntent's servers.

121.    Plaintiffs and California Subclass Members have suffered loss by reason of these violations, including, but not limited to, violations of their rights to privacy and loss of value in their personally identifiable information.

122.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by the violations of Cal. Penal Code § 631, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

### B.  Pen register – Cal. Penal Code § 638.51

123.    CIPA § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

124.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

125.    CIPA § 638.50(b) defines pen register as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

126.    Courts have repeatedly recognized that in the Internet era, pen registers can take the form of software and, as a result, private companies and persons have the ability gather the same electronic information as law enforcement.  The California legislature does not limit its prohibition on installing pen registers to law enforcement.

127.    DeepIntent's Tracking Tools and/or other similar computer codes and programs, as described at paragraphs 45-61 above, constitute "pen registers" because they are "devices" or "processes" that "record" "addressing or signaling information"—such as Plaintiffs' and California Subclass Members' IP addresses—from the electronic communications transmitted by users' internet-connected devices.

128.    DeepIntent was not authorized by any court order to use a pen register to record Plaintiffs' and California Subclass Members' routing, addressing, or signaling information.

129.    As a direct and proximate result of DeepIntent's conduct, Plaintiffs and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

130.    At all relevant times, DeepIntent's conduct alleged herein was without the authorization and consent of Plaintiffs and California Subclass Members.

131.    Unless enjoined, DeepIntent will continue to commit the violations of law alleged here.

132.    Plaintiffs and California Subclass Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

<u>**COUNT II**</u>
**Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.**
**(On Behalf of the Class)**

133.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

134.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

135.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA") prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device.  18 U.S.C. § 2511.

136.    The ECPA protects both the sending and receipt of communications.

137.    The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA. 18 U.S.C. § 2520(a).

138.    DeepIntent intentionally intercepted electronic communications that Plaintiffs and Class Members exchanged with websites by tracking individuals while they were browsing the

internet through the direct placement and utilization of its Tracking Tools and/or computer code and programs on websites, as described herein at paragraphs 45-61 above.

139.    DeepIntent's interception of Internet communications that Plaintiffs and Class Members were sending and receiving was done contemporaneously with the sending and receipt of those communications.  Specifically, and as described at paragraphs 45-61 above, DeepIntent sets its CDIUSER cookie and web beacons/pixels on websites such that DeepIntent captures and transmits information as an individual navigates through webpages on which it is present.

140.    On information and belief, DeepIntent has used these trackers to intercept the contents of Plaintiffs' and Class Members' communications, including but not limited to the precise URL of each article and webpage visited by Plaintiffs, as well as the exact search queries inputted by Plaintiffs on those websites.

141.    The transmission of data between Plaintiffs and Class Members on the one hand and the websites on which DeepIntent tracked and intercepted their communications on the other, without authorization were "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

142.    The following instruments constitute "devices" within the meaning of the ECPA:

    a.    DeepIntent's Tracking Tools and/or other similar computer code and programs designed to intercept, collect, transmit, and track consumers' private information;

    b.    Plaintiffs' and Class Members' browsers;

    c.    Plaintiffs' and Class Members' computing and mobile devices; and

d.   The plan DeepIntent carried out to effectuate its tracking and interception of consumers' private information and communications while browsing the Internet.

143.   DeepIntent, in its conduct alleged here, was not providing an "electronic communication service," as that term is defined in 18 U.S.C. § 2510(12) and is used elsewhere in the Wiretap Act.  DeepIntent was not acting as an Internet Service Provider (ISP).

144.   As described above, the communications between Plaintiffs and Class Members, on the one hand, and websites on the other, were simultaneous to, but separate from, the channel through which DeepIntent acquired the contents of those communications.

145.   DeepIntent was not a party to these communications because Plaintiffs and Class Members were unaware of DeepIntent's interception of their communications with websites, and Plaintiffs and Class Members did not knowingly send any communication to DeepIntent. DeepIntent could not manufacture its own status as a party to Plaintiffs' and Class Members' communications with websites and apps by surreptitiously intercepting those communications.

146.   Plaintiffs and Class Members were unaware of, and did not consent to, DeepIntent's acquisition of their communications with the websites they visited, as described above.  DeepIntent did not obtain legal authorization to obtain Plaintiffs' and Class Members' communications with the websites they visited.  Any purported consent that DeepIntent received from websites to obtain was not valid.

147.   DeepIntent's interception of Plaintiffs' and Class Members' communications was done for purposes of committing criminal and tortious acts, including violations of CIPA, Article I, Section of California's constitution, and a knowing intrusion on Plaintiffs' and California Subclass Members' seclusion.

148.     For DeepIntent's violations set forth above, Plaintiffs and Class Members seek appropriate equitable or declaratory relief, including injunctive relief, actual damages and "any profits made by [DeepIntent] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

149.     Unless enjoined, DeepIntent will continue to commit the violations of law alleged here.

150.     Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members seek monetary damages for the greater of (i) the sum of the actual damages suffered by Plaintiffs and Class Members and any profits made by DeepIntent as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## COUNT III
### Invasion of Privacy Under the California Constitution
### (on behalf of the California Subclass)

151.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

152.     Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

153.     Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."  Cal. Const. Art. I, Section 1.

154.     The right to privacy in California's Constitution creates a right of action against private and government entities.

155.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

156.    Plaintiffs and California Subclass Members have and continue to have a reasonable expectation of privacy in their health-related personal information and web activity.

157.    Plaintiffs and California Subclass Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by DeepIntent included Plaintiffs' and California Subclass Members' personal, sensitive health-related information; and (ii) Plaintiffs and California Subclass Members did not consent or otherwise authorize DeepIntent to collect and use this private information.

158.    Plaintiff and California Subclass Members had a reasonable expectation of privacy that their communications, identities, and sensitive health-related personal information would remain private and that DeepIntent would not install surreptitious technologies on health-related websites to secretly intercept and transmit their communications to third parties, including advertisers and ad agencies.

159.    In violation of Plaintiffs' and California Subclass Members' reasonable expectation of privacy, DeepIntent intercepts, collects, tracks, and compiles their internet activity and communications, and makes access to that data available for sale.  This information includes Plaintiffs' and California Subclass Members' location data and web browsing information, including sensitive health-related information.  Such information is "personal information" under California law.  *See* Cal. Civ. Code § 1798.140 (defining personal information as including "Internet or other electronic network activity information," such as "browsing history, search

history, and information regarding a consumer's interaction with an internet website, application, or advertisement.").

160.    DeepIntent has violated Plaintiffs' and California Subclass Members' reasonable expectation of privacy by surreptitiously intercepting and amassing information reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives into profiles for future or present use.  In addition, those profiles are and can be used to further invade Plaintiffs' and California Subclass Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising purposes, as described herein, thereby harming them by selling this data to advertisers without their consent.

161.    Given the sensitive nature of the health-related information that DeepIntent intercepted and collected, including information concerning users' health conditions and medications/treatments, DeepIntent's conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

162.    DeepIntent's interception and amassment of electronic communications reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives is highly offensive to a reasonable person, and constitutes an unreasonable, substantial, and serious interference with Plaintiffs' and California Subclass' Members' rights to privacy.

163.    In addition, DeepIntent's violations of various state and federal statutes (as described herein) are an independent and egregious breach of social norms.

164.    At a minimum, DeepIntent's invasion of privacy harmed Plaintiffs and California Subclass Members in the following ways:

      a.    Sensitive and confidential health-related information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

    b.   DeepIntent took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass Members' knowledge or informed consent and without sharing the benefit of such value;

    c.   DeepIntent's actions diminished the value of Plaintiffs' and California Subclass Members' personal information.

165.    Plaintiffs and California Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of DeepIntent's actions, which caused injury to Plaintiffs and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter DeepIntent from engaging in such conduct in the future.

### COUNT IV
### Intrusion Upon Seclusion Under California Common Law
### (on behalf of the California Subclass)

166.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

167.    Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

168.    A plaintiff asserting a claim for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

169.    In violation of Plaintiffs' and California Subclass Members' reasonable expectation of privacy, DeepIntent intercepts, collects, tracks, and compiles their internet activity and communications, and makes access to that data available for sale. This information includes Plaintiffs' and California Subclass Members' location data and web browsing information,

including sensitive health-related information. Such information is "personal information" under California law. *See* Cal. Civ. Code § 1798.140 (defining personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement.").

170.    DeepIntent has violated Plaintiffs' and California Subclass Members' reasonable expectation of privacy by surreptitiously intercepting and amassing information reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives into profiles for future or present use. In addition, those profiles are and can be used to further invade Plaintiffs' and California Subclass Members' privacy by, for example. allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers without their consent.

171.    Further, the extent of DeepIntent's intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and California Subclass Members' personal information with potentially countless third parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity.

172.    Given the sensitive nature of the health-related information that DeepIntent intercepted and collected, including information concerning users' medical conditions and medications/treatments, DeepIntent's conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

173.    DeepIntent's interception and amassment of electronic communications reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives

is highly offensive to a reasonable person, and constitutes an unreasonable, substantial, and serious interference with Plaintiffs' and California Subclass' Members' rights to privacy.

174.    In addition, DeepIntent's violations of various state and federal statutes (as described herein) are an independent and egregious breach of social norms.

175.    DeepIntent lacks a legitimate business interest in stockpiling and compiling the personal, healthcare-related information of Plaintiffs and California Subclass Members.

176.    Plaintiffs and California Subclass Members have been damaged by DeepIntent's invasion of their privacy and are entitled to just compensation and injunctive relief.

177.    As a result of DeepIntent's actions, Plaintiffs and California Subclass Members seek injunctive relief in the form of DeepIntent's cessation of tracking practices in violation of Plaintiffs' and California Subclass Members' rights, and destruction of all personal information obtained in violation of Plaintiffs' and California Subclass Members' rights.

178.    As a result of DeepIntent's actions, Plaintiffs and California Subclass Members seek nominal and punitive damages in an amount to be determined at trial.  Plaintiffs and California Subclass Members seek punitive damages because DeepIntent's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and California Subclass Members and made in conscious disregard of their rights.  Punitive damages are warranted to deter DeepIntent from engaging in future misconduct.

179.    Plaintiffs and California Subclass Members seek restitution for the unjust enrichment obtained by DeepIntent as a result of unlawfully collecting Plaintiffs' and California Subclass Members' personal information.

**COUNT FIVE**
**Unjust Enrichment**
**(on behalf of the Class)**

180.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

181.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

182.    Plaintiffs and Class Members personally and directly conferred a benefit on DeepIntent in the form of sensitive personal health-related information that DeepIntent surreptitiously collected from Plaintiffs and Class Members.  DeepIntent collected, used, and disclosed this information for its own gain, including for advertising purposes.

183.    DeepIntent has been unjustly enriched at the expense of Plaintiffs and Class Members, and DeepIntent has unjustly retained the benefits of its unlawful and wrongful conduct.

184.    It would be inequitable and unjust for DeepIntent to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

185.    Plaintiffs and Class Members are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that DeepIntent obtained as a result of its unlawful and wrongful conduct.

186.    When a defendant is unjustly enriched at the expense of a plaintiff, the plaintiff may recover the amount of the defendant's unjust enrichment even if plaintiff suffered no corresponding loss, and plaintiff is entitled to recovery upon a showing of merely a violation of legally protected rights that enriched a defendant.  DeepIntent has been unjustly enriched by virtue of its violations of Plaintiffs' and Class Members' legally-protected rights to privacy as alleged herein, entitling Plaintiffs and Class Members to restitution of DeepIntent's enrichment.

187.    DeepIntent was aware of the benefit conferred by Plaintiffs and Class Members. Indeed, DeepIntent's DSP is premised on DeepIntent's ability to collect massive amounts of information, including health-related information, on users who access websites that have integrated DeepIntent's Tracking Tools.  DeepIntent therefore acted in conscious disregard of the rights of Plaintiffs and Class Members and should be required to disgorge all profit obtained therefrom to deter DeepIntent and others from committing the same unlawful actions again.

## COUNT SEVEN
### Declaratory Judgment
### (on behalf of the Class)

188.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

189.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

190.    The gravamen of this controversy lies in DeepIntent's collection, tracking, and analysis of Plaintiffs' and Class Members' personal information and behavior, building dossiers based on that information, and providing access to that information to third parties.  Plaintiffs and Class Members never consented to, or were even aware of, DeepIntent's conduct described herein.

191.    DeepIntent's misconduct has put Plaintiffs' and Class Members' privacy and autonomy at risk, and violated their dignitary rights, privacy, and economic well-being.

192.    Accordingly, Plaintiffs seek appropriate declaratory relief, and injunctive relief as prayed for below.

## PRAYER FOR RELIEF

193.    WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Issue an order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper

class representatives, that Plaintiffs' attorneys shall be appointed as counsel for the Class and the California Subclass pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that class notice be promptly issued;

b.  Certify this action is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

c.  Appoint Plaintiffs to represent the Class and California Subclass;

d.  Appoint undersigned counsel to represent the Class and California Subclass;

e.  Enter judgment in favor of Plaintiffs and Class Members against DeepIntent awarding damages, including punitive damage, and/or nominal damages, to Plaintiffs and Class Members, in an amount according to proof at trial, including interest thereon;

f.  Enter judgment in favor of Plaintiffs and Class Members against DeepIntent awarding restitution of DeepIntent's ill-gotten gains, revenues, earnings, or profits that it derived, in whole or in part, from its unlawful collection and use of Class Members' personal information, in an amount according to proof at trial;

g.  Enter declaratory judgment in favor of Plaintiffs and Class Members against DeepIntent pursuant to 28 U.S.C. § 2201 declaring that DeepIntent's conduct is unlawful as alleged herein;

h.  Permanently restrain DeepIntent, and its officers, agents, servants, employees, and attorneys, from intercepting, tracking, collecting, or compiling the personal information of Class Members as alleged herein;

i.  Award Plaintiffs and Class Members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    j.   Grant Plaintiffs and Class Members further equitable, injunctive, declaratory, or other relief as the Court deems appropriate.

## VII.   <u>JURY DEMAND</u>

194.   Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  October 28, 2025

                                    */s/ Adam M. Harris*

Adam M. Harris
Andrew Cauchi
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, New York 10004
Tel.: 212-350-8850
adam.harris@davidllc.com
andrew.cauchi@davidllc.com

Gary M. Klinger (*pro hac vice forthcoming*)
**MILBERG PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel.: 866-252-0878
gklinger@milberg.com

*Attorneys for Plaintiffs Dominique Cavalier, Nina Harris, and Gerald Harris, and the Classes*