**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NINA HARRIS and GERALD HARRIS, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DEEPINTENT TECHNOLOGIES, INC.<br><br>Defendant. | Case No. 1:25-cv-08949-RA<br><br>**AMENDED CLASS ACTION COMPLAINT [REDACTED]**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Nina Harris and Gerald Harris ("Plaintiffs") individually and on behalf of all others similarly situated, bring this action against DeepIntent Technologies, Inc. ("DeepIntent"). Plaintiffs' allegations against DeepIntent are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## I. NATURE OF THE ACTION

1. This class action lawsuit arises from Defendant DeepIntent's extensive web tracking of millions of Americans' healthcare-related online behaviors without those users' knowledge or consent.

2. DeepIntent calls itself "The Most Powerful Healthcare Advertising Platform." Its main product offering is its "demand-side platform" (DSP), which is utilized by healthcare-focused advertisers, including major pharmaceutical companies, which seek to purchase advertising space on prominent health-related websites frequented by millions of Americans each year.

3. DeepIntent's entire business model as a DSP is built on the unlawful interception and collection of massive amounts of sensitive, personally identifiable health information of consumers and patients of numerous healthcare industry companies across the country.

4. As detailed below, by surreptitiously embedding tracking software on numerous health-related websites without users' knowledge or consent, DeepIntent tags each user with a permanent identifying number, allowing DeepIntent to monitor that individual across the internet (and beyond). Through this identifier and similar tracking technologies described herein, DeepIntent collects users' specific web activity – including websites and specific webpages visited, ads clicked, and even the contents of users' specific communications with these websites, including text of URLs and search queries entered by the user – allowing DeepIntent to easily ascertain information regarding users' health conditions, medical treatments, and other similarly sensitive topics.

5. DeepIntent has accomplished this even though (and, indeed, because) virtually no consumer has ever heard of it, no consumer has ever actually consented to any of its activities in question, and no consumer has a meaningful ability to opt-out of its tracking.

6. Plaintiffs therefore bring this action on behalf of themselves, and others similarly situated, to enforce their fundamental constitutional, common law, and statutory rights to privacy, which DeepIntent has violated and continues to violate.

## II. THE PARTIES

7. Plaintiff Nina Harris resides in Camarillo, California. Plaintiff Harris was in California when she accessed healthline.com and reachmd.com to research a personal health condition, and accessed ozempic.com to research a health condition of her husband, Plaintiff Gerald Harris. Healthline.com, reachmd.com, and ozempic.com are health-related websites on

which DeepIntent has integrated its tracking technologies (as described herein), and DeepIntent tracked her activity on those websites and subsequent activity on other websites and apps. Plaintiff Nina Harris accessed these websites from approximately 2023 to 2024. Plaintiff Harris made specific search queries on these websites related to [redacted].

8. Plaintiff Gerald Harris resides in Camarillo, California. Plaintiff Harris was in California when he accessed ozempic.com to research a personal health condition. Ozempic.com is a health-related website on which DeepIntent has integrated its tracking technologies (as described herein), and DeepIntent tracked his activity on that website and subsequent activity on other websites and apps. Plaintiff Gerald Harris accessed these websites in approximately 2024.

9. Neither Plaintiff Nina Harris nor Plaintiff Gerald Harris would have accessed these sites if they knew that their personal and/or health data or their partner's personal and/or health data would be shared and/or sold.

10. Defendant DeepIntent is a Delaware corporation headquartered in New York, New York. DeepIntent is wholly owned by Propel Media, Inc., a holding company incorporated in Delaware and headquartered in Wyoming.

## III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the federal claim in this action pursuant to 28 U.S.C. § 1331.

12. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this case is a class action where the aggregate claims of all

members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendant.

13. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

14. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in New York and a substantial part of Defendant's conduct giving rise to this action took place in New York.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) Defendant DeepIntent resides in this District, (ii) Defendant DeepIntent is subject to the Court's jurisdiction with respect to this action, and (iii) a substantial part of the events giving rise to the claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Overview of Digital Advertising Technology (Adtech)

16. DeepIntent's primary purpose for surreptitiously intercepting and collecting consumers' personal information is to profit by participating on behalf of its advertiser clients in "Real-Time Bidding" (RTB) auctions.

17. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[1]

[1] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

18. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[2] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[3]

19. In other words, SSPs provide user information to advertisers that might be interested in those users; DSPs (like DeepIntent) are platforms for advertisers, helping them select which users to target with advertisements; and the Advertising Exchange effectively serves as a middleman, functioning as a digital marketplace where advertisers, website/app publishers, DSPs, and SSPs can participate in bidding on advertising inventory from various publishers using RTB.

20. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client. Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. [4]

21. When a user opens a website (or an app), that website (or app) publisher's SSP sends out a "bid request" that contains (i) information about the user, including device type and IP

---

[2] Geoghegan, *supra*.

[3] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[4] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

address,[5] which also gives geolocation information—locating a device at the city level with extremely high accuracy and often providing location information down to the user's ZIP code; (ii) information about the context of the site visit, including the webpage URL (i.e., web address); and (iii) any restrictions imposed on advertisements by the website. This information is known as "bidstream data."

22. The bid request is sent to the Advertising Exchange, which then broadcasts the bid request to multiple DSPs. Each DSP will evaluate the bid request, determining – based on guidelines and instructions from the advertisers with which they are partnered – whether the website user matches any of their target audience segments.

23. If the user is a match for an advertiser's criteria, the DSP will instantly calculate a bid (e.g., $1.00 CPM, or "cost per mille")[6] for a particular ad to be displayed.

24. The Advertising Exchange then holds the auction: all DSP bids are collected, and the highest bidder wins (i.e. buys) the right to display its advertisement on the webpage.

25. The RTB process occurs in a matter of milliseconds entirely outside of the website user's view. From the user's perspective, the website finishes loading, and the ad slot on the website displays an ad.

26. Facilitating this real-time bidding process means DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers. Indeed, because the main function of a DSP is to buy digital ad space as efficiently and effectively as possible on behalf of advertisers, DSPs will seek to obtain as much detailed data on a user before

---

[5] An IP address is a unique numerical label assigned to each device that connects to the internet. (e.g., 123.456.789.123). The first two sets of numbers indicate what network the device is on (e.g., 123.456), and the second two sets of numbers identify the specific device (e.g., 789.123).

[6] "Cost per mille" is one of the most common pricing models in digital advertising. In a CPM model, an advertiser pays a certain amount per 1,000 "impressions" (i.e. each ad being served). Thus, in this example, the advertiser bid $1 for every 1,000 times its ad is shown.

calculating and submitting a bid for an advertisement. If a user matches the advertiser's ideal customer profile, the DSP may bid higher for an ad on behalf of a particular advertiser. If the user is a poor fit for a particular advertisement, the DSP may bid little or nothing during the auction. For example, if a pharmaceutical brand is running an online ad campaign for a prostate cancer drug, it would make little sense to show an ad for that drug to a female user.

27. Thus, DSPs – including DeepIntent – do not rely solely on bidstream data in determining whether (and how much) to bid for a particular advertising impression. Rather, DSPs typically seek to enrich the bidstream data with data from other sources of information, including additional information about the user collected by the DSP itself as well as third-party data on the user available to the DSP through partnerships with data brokers and "Data Management Platforms" (DMPs):

> The economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP). DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.[7]

28. For example, bidstream data typically includes a "device ID" – i.e., a unique identifier assigned to a user's computer or smartphone – which the DSP will try to match against its own data. If there is a match to that device ID, the DSP then "knows" that it has seen a particular user on a website or on other websites across the web with which the DSP is also partnered. For

[7] Michael Veale & Frederik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

example, a DSP can recognize a website user who searched for a specific healthcare treatment last week on another publisher's site with which the DSP is also partnered.

29. In addition, DSPs – including DeepIntent – will also use data obtained from third-party data brokers and DMPs to pull in even more detailed information on the user, including demographic, behavioral, or purchase-intent information:




30. Through this extensive data collection process, DSPs (like DeepIntent) can determine with extreme precision who a user is – i.e., the user's age, gender, location – along with their likely interests, preferences, and other characteristics. For example, a DSP may identify a specific user on a health-related website as a "35-44 year old male in Southern California with an active lifestyle who frequently shops for diabetes testing supplies."

31. Even if a DSP does not win the auction, "the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction. This information can be added to existing dossiers DSPs have on a user."[8] This greatly diminishes the ability of users to control their personal information.

---

[8] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

32. In addition, advertisers want to know which audiences are engaging with or making purchases based on their advertisements. Thus, DSPs also track detailed user interactions across websites and apps, then feed that data back into algorithms to optimize future bidding and targeting.

33. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (a) "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> (b) "send[ing] sensitive data across geographic borders."
>
> (c) sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder—actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[9]

34. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[10]

---

[9] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[10] Geoghegan, *supra*.

35. For these reasons, some have characterized RTB as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive users' personal information:[11]

36. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and by statutes like the California Invasion of Privacy Act ("CIPA"). *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

---

[11] IRISH COUNCIL FOR CIVIL LIBERTIES, THE BIGGEST DATA BREACH EVER RECORDED (May 16, 2022), https://www.iccl.ie/wp-content/uploads/2022/05/Mass-data-breach-of-Europe-and-US-data-1.pdf

### B. DeepIntent Contemporaneously Intercepts Users' Communications With Websites Via Cookie Syncing

37. Both the capabilities of DSPs and the reasons that DeepIntent installs its tracking technologies on websites (to intercept as much user information as possible to provide to advertisers in real-time bidding) are clear. The method through which DeepIntent shares information with other services to offer the most complete user profiles up for sale occurs through a process known as "cookie syncing."

38. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[12]

39. Cookie syncing (or "CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3)*.
>
> …

[12] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[13]




40. Through this process, DeepIntent is not only able to resolve user identities (*e.g.*, learning that the person who website 1 knew as "userABC" and website 2 knew as "user123" are the same person), but it can also "track a user to a much larger number of websites," even those who "do not have any collaboration with" DeepIntent.[14]

[13] Papadopoulos, *supra*, at 1433 (emphases added).

[14] *Id.* at 1434.

41. Indeed, "CSync may re-identify web users even after they delete their cookies."[15] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[16] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[17]

42. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[18]

43. Cookie syncing is precisely what is happening here. When DeepIntent's tracking technologies are installed on users' browsers, DeepIntent syncs their unique user identifier(s) with other identifiers assigned to users by third parties on the websites. The result of this process is not only that a single user is identified as one person by these multiple parties, but that those parties share all the information about that user with one another (because the cookie is linked to a specific individual user). This prevents users from being anonymous when they visit websites.

44. As noted above, DeepIntent's main product offering is its healthcare-focused DSP. As a DSP, DeepIntent plays a central role in enabling and profiting from the RTB ecosystem. It does so through invasive and pervasive surveillance, profiling, and targeting of users, without their consent or knowledge.

---

[15] *Id.*

[16] *See id.*

[17] *Id.*

[18] *Id.* at 1441.

45. DeepIntent's primary method for surveilling and intercepting website/app user data is through web-based tracking technologies, such as cookies, pixels and web beacons ("Tracking Tools"), which are integrated into health-related websites that have agreed to host such technologies.

46. Cookies are small text files that can be used to store information on a user's browser which can later be communicated to a server.

47. CDIUSER is a cookie that DeepIntent surreptitiously sets in a user's browser when they visit a health-related website that has partnered with DeepIntent.

48. CDIUSER functions by providing a unique identifier for each user, which allows DeepIntent to recognize the same browser or device across different webpage visits and across partner websites.

49. DeepIntent's tracking software automatically checks to determine if that user already has a CDIUSER identifier stored in their browser. If so, DeepIntent will recognize the user as one who has previously been to the website; if not, DeepIntent will generate a new CDIUSER identifier for the user.

50. CDIUSER is a "persistent" identifier, in that it remains stored on the user's device (computer, phone, tablet, etc.) long after the user leaves a website. In fact, DeepIntent's CDIUSER identifier follows users across the web for more than a year.

51. In effect, CDIUSER is the "glue" that allows DeepIntent to link users' browsing history, location data, and other personal information into a unified advertising profile. The below screenshots from everydayhealth.com and breastcancer.org – websites that have integrated DeepIntent's Tracking Tools – demonstrate how the same CDIUSER identifier is retained across both websites for the same actual user:

| | |
|---|---|
| :authority: | match.deepintent.com |
| :method: | GET |
| :path: | /usersync/114/store?ext1=0c4075e0-9af9-11ef-b29c-977f9299e7e0&id=UNK |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cache-Control: | no-cache |
| Cookie: | CDIUSER=di_cf2e2ccecbc643b883793; CDIPARTNERS=%7B%221%22%3A%2220240620%22%2C%22129%22%3A%2220241024%22%2C%22136%22%3A%2220240813%22%2C%22106%22%3A%2220241024%22%2C%22108%22%3A%2220241022%22%2C%22141%22%3A%2220241004%22%2C%22142%22%3A%2220241030%22%2C%22112%22%3A%2220241025%22%2C%22144%22%3A%2220240726%22%2C%22113%22%3A%2220240627%22%2C%22114%22%3A%2220240627%22%2C%22147%22%3A%2220241022%22%2C%22149%22%3A%2220240910%22%2C%22150%22%3A%2220241022%22%2C%22152%22%3A%2220240715%22%2C%22121%22%3A%2220241022%22%2C%22122%22%3A%2220240627%22%2C%22126%22%3A%2220241030%22%7D |
| Pragma: | no-cache |
| Priority: | i |
| Referer: | https://www.breastcancer.org/ |

| | |
|---|---|
| :authority: | match.deepintent.com |
| :method: | GET |
| :path: | /usersync/114/store?ext1=0c4075e0-9af9-11ef-b29c-977f9299e7e0&id=UNK |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cache-Control: | no-cache |
| Cookie: | CDIUSER=di_cf2e2ccecbc643b883793; CDIPARTNERS=%7B%221%22%3A%2220240620%22%2C%22129%22%3A%2220241024%22%2C%22136%22%3A%2220240813%22%2C%22106%22%3A%2220241024%22%2C%22108%22%3A%2220241022%22%2C%22141%22%3A%2220241004%22%2C%22142%22%3A%2220241030%22%2C%22112%22%3A%2220241025%22%2C%22144%22%3A%2220240726%22%2C%22113%22%3A%2220240627%22%2C%22114%22%3A%2220240627%22%2C%22147%22%3A%2220241022%22%2C%22149%22%3A%2220240910%22%2C%22150%22%3A%2220241022%22%2C%22152%22%3A%2220240715%22%2C%22121%22%3A%2220241022%22%2C%22122%22%3A%2220240627%22%2C%22126%22%3A%2220241030%22%7D |
| Pragma: | no-cache |
| Priority: | i |
| Referer: | https://www.breastcancer.org/ |

52. As reflected in these screenshots, through the CDIUSER identifier, DeepIntent and any of its interested advertiser clients would know that the same individual is interested in both topics on everydayhealth.com as well as BreastCancer.org.

53. The screenshot below from everydayhealth.com shows DeepIntent's pixel (px.deepintent.com) working in conjunction with DeepIntent's CDIUSER persistent identifier:




54. As demonstrated in the screenshot, through these Tracking Tools, DeepIntent intercepts the precise URL of each webpage visited by any user, as well as the exact search query input by that user. As a result, DeepIntent (and its advertiser clients) learns, and indeed intends to learn, that the actual user whose information is reflected above searched for "Care for HIV" on everydayhealth.com.

55. When a user enters a search query, DeepIntent contemporaneously intercepts and transmits that data. In other words, the user's communication with the website is intercepted while

in transit to the website. Each transmission is timestamped, both with a date and time in the conventional sense, as well as with what is called a "Unix timestamp." A Unix timestamp is a 10-character code that provides the date and time down to the precise second.

56. The Unix timestamp is a literal counter of seconds passed since January 1, 1970. For example, the Unix timestamp corresponding to 1 A.M. EST on March 3, 2026, is approximately **1772517590** and increased by 1 each second.

57. The below screenshot is an export of the browser's network log from the user's live browsing session on healthline.com. It captures the actual HTTP requests and responses sent and received at the time that the user interacted with the site. Each entry is timestamped, reflecting when the transmission occurred during the session. The below screenshot demonstrates that DeepIntent intercepts and transmits the user's data at the same time.



58. The below screenshots from Ilumya.com (a plaque psoriasis drug) shows DeepIntent's web beacon (beacon.deepintent.com) working in conjunction with DeepIntent's CDIUSER persistent identifier:




59. The above screenshots also reflect the insertion of DeepIntent's "CDIPARTNERS" cookie. DeepIntent uses CDIPARTNERS to manage integrations with its partners, such as data brokers, SSPs, or website/app publishers, through cookie syncing.

60. When DeepIntent integrates with an external partner (such as a website publisher's SSP), that SSP may have its own identifier for a specific user (i.e. different than the CDIUSER identifier that DeepIntent has assigned to the user). CDIPARTNERS works as a "bridge" between that external ID and DeepIntent's own CDIUSER identifier, ensuring that DeepIntent knows that the SSP's ID for that user (e.g., ABC123) is the same as the CDIUSER ID for the same user (e.g., DEF456).

61. The DeepIntent pixel continues firing even if a user opts out of cookies (both "tracking" and "performance" cookies). Specifically, DeepIntent continues to receive

transmissions containing identifying CDIUSER and CDIPARTNERS cookies even if a user opts out of cookies, as demonstrated by the below screenshots:












62. In addition, when a user visits a DeepIntent-integrated website, DeepIntent also receives the user's IP address, through which DeepIntent can determine the user's state, city, and zip code. This allows DeepIntent's advertiser clients to target specific households, businesses, and even individuals with ads that are relevant to their interests.

63. In addition to the IP address, when a user visits a DeepIntent-integrated website, DeepIntent also receives information about the user's operating system and platform, browser, and timestamps. The below screenshots show the categories of information that DeepIntent receives:






64. DeepIntent deploys its Tracking Technologies behind the scenes, outside of the view (and knowledge) of consumers. Indeed, the full scope and extent of DeepIntent's tracking and compiling of users' personal information resides with DeepIntent itself, is not fully disclosed by DeepIntent, and therefore must be fully determined through discovery. However, it is believed that DeepIntent tracks users' activity on scores of healthcare-related websites, intercepting and collecting searches and viewing of content by a massive number of users. At a minimum, DeepIntent's Tracking Tools have been integrated into the following health-related websites which are viewed by millions of Americans each year:

- Everyday Health Group [https://everydayhealth.com]
- Healthline [https://healthline.com]

- Ozempic website [https://ozempic.com] (Novo Nordisk)
- Zepbound website [https://zepbound.lilly.com] (Eli Lilly)
- Genteal Tears website [https://gentealtears.myalcon.com/] (Alcon, Inc.)
- Ilumya website [https://ilumya.com] (Sun Pharma)
- BreastCancer.org
- Reachmd.com
- Onetouch.com (diabetes care)

65. DeepIntent functions on these sites solely as an independent third party whose services are not essential to the websites' core functionality. DeepIntent exists purely to harvest user data for independent commercial purposes.

66. DeepIntent also specifically targets health data.

67. Indeed, DeepIntent's own marketing materials describe DeepIntent as "the leading healthcare demand-side platform."[19]




[19] https://deepintent.com/news.




68. Through its expansive network of partner websites, DeepIntent aggregates intercepted user data across multiple sites and sessions to build a comprehensive behavior profile on the user, focusing on healthcare interests and likely medical conditions.

69. DeepIntent's tracking of users' activity goes beyond website activity. For example, through DeepIntent's partnership with LG Ad Solutions, DeepIntent collects information about users' internet-connected television viewership habits and data (for example, if a user watches health-related content on a streaming platform through the user's television.)

70. DeepIntent has also integrated Automated Content Recognition ("ACR") smart television data into its advertising and measurement products. In a 2023 article titled "All About ACR Data: Your TV Campaign's Missing Ingredient," DeepIntent explained that ACR technology embedded in smart TVs captures information about what content a household watches across linear TV and streaming platforms, and that DeepIntent uses this ACR data to plan and measure pharmaceutical campaigns.[20]

71. DeepIntent promotes its ability to match ACR-based TV exposure data with real-world clinical outcomes, allowing pharmaceutical marketers to understand which households exposed to certain TV ads then show increased prescription activity for the advertised drugs.[21]

---

[20] https://deepintent.com/deepdive/all-about-acr-data

[21] https://www.prnewswire.com/news-releases/deepintent-launches-patient-planner-revolutionizing-how-patient-audiences-and-campaigns-are-planned-and-activated-301618574.html

72. By combining ACR data with claims and identity data, DeepIntent can associate a household's TV viewing habits with that household's sensitive health information. This combination makes it possible to infer which specific individuals in the household likely have particular diagnoses, which medications they have been prescribed, and how they respond to specific TV ads—all without consumers' knowledge or consent.

73. In 2024–2026, the Texas Attorney General brought enforcement actions against major smart TV manufacturers over their ACR programs, characterizing ACR as an "uninvited, invisible digital invader" that tracks what consumers watch without meaningful consent.[22] DeepIntent's decision to ingest and link ACR data with prescription claims intensifies the privacy harm by tying household viewing behavior directly to health-related outcomes.

74. DeepIntent also supplements the data it has collected through its own technologies (including the Tracking Tools) with data from multiple third-party data providers, which aggregate information from other websites (i.e., those outside the DeepIntent network), apps, public records, or consumer surveys. This information can include a user's demographic information (*e.g.*, age range, gender, household income, education level), lifestyle and interest data (*e.g.*, fitness habits, diet preferences, health concerns inferred from browsing outside of DeepIntent's network), and location-based signals (*e.g.*, ZIP-code level health trends or geolocation patterns).

75. Ultimately, DeepIntent compiles all of this information into what it describes as an "industry-leading identity graph." An identity graph is a database or framework that links together all the different identifiers associated with a single person – persistent identifiers (like CDIUSER),

[22] https://iapp.org/news/a/automated-content-recognition-technology-takes-privacy-enforcement-spotlight

mobile ad IDs ("MAIDs"),[23] CTV IDs (*i.e.*, smart TV identifiers), IP addresses, device characteristics, and contextual and demographic data – unifying them into one profile for targeting, measurement, and personalization.

76. Armed with a massive amount of information about the user, DeepIntent then groups the user into hundreds or thousands of specific cohorts, or "audiences." These audiences can range from hyper-specific segments of users (such as "21-30 year old males with asthma who reside in California and have an active lifestyle") to larger, more general groups of people (such as "people with asthma").

77. In other words, DeepIntent deliberately categorizes users based on their intercepted web activity.

78. DeepIntent's own marketing materials demonstrate this deliberate categorization.

79. For example, in a September 2024 press release about DeepIntent's partnership with EverydayHealth, DeepIntent boasted that, "… the partnership will include the ability to efficiently reach qualified audiences across top-tier properties including Everyday Health, BabyCenter, WhatToExpect, MedPage Today and EHG's Trusted Care Access Portfolio (TCAP) of leading medical center sites along with future audience and measurement products. ***The two organizations plan to create enhanced targeting through EHG-branded audience segments*** and jointly develop audiences with data from the two companies, which will allow for precise engagement with health-focused users for improved campaign performance."[24] (emphasis added).

---

[23] A "MAID" is a unique identifier that a smartphone's operating system assigns to the device for advertising and tracking purposes. MAIDs in the Android mobile operating system are referred to as AAIDs (Android Advertising IDs), while the Apple iOS mobile operating system's MAIDs use the initialism IDFA (ID for Advertisers).

[24] https://deepintent.com/news/deepintent-everyday-health-group-partnership.

80. In addition, in a DeepIntent article from March 2025, DeepIntent explains that, "[i]n healthcare advertising, scale is only valuable when it is relevant. Cortex delivers this with new HealthFirst™ Packages, curated marketplaces that provide seamless access to premium endemic inventory and connected TV (CTV) placements."[25]

81. "Endemic inventory" refers to web users who have been segmented into groups based on medical conditions or other traits inferred from the user's behavior on the web or on other platforms such as a CTV.

82. DeepIntent then sells access to these audiences to healthcare-focused advertisers and ad agencies through its DSP. In other words, DeepIntent directly profits from its extensive interception, collection, and aggregation of information – including sensitive health-related information – on consumers.

83. Going even further, DeepIntent touts its ability to track "conversions," or instances in which the same person who viewed an advertisement went on to make the purchase suggested by the advertisement or otherwise took steps that would indicate having been influenced by the advertisement. In particular, DeepIntent explicitly touts its ability to measure "script lift," *i.e.*, whether an audience for a particular pharmaceutical drug advertisement shows higher prescription fill rates than a control group.

84. When a user visits a site and an ad for a pharmaceutical product is shown, DeepIntent (via cookies and/or web beacons/pixels) logs an impression tied to the user's assigned identifier (*e.g.*, CDIUSER). DeepIntent then attempts to probabilistically match that ad exposure to prescription fill events, by using data from third-party data aggregators that measure de-identified pharmacy claims data and electronic health records. For example, DeepIntent – through

[25] https://deepintent.com/news/deepintent-unveils-deepintent-cortex.

its own Tracking Tools – can determine that households in a particular zip code (including the user's zip code) were served ads for the pharmaceutical drug, and then use pharmacy claims data to determine that prescriptions for that drug increased in that particular zip code.

85. Through this process, DeepIntent can determine – with a high degree of probability – that a specific user filled a prescription for that advertised pharmaceutical drug, even if the user never clicked on/engaged with the ad or otherwise made reference to that drug purchase online. Of course, that probability increases even further if DeepIntent has, through its Tracking Tools, intercepted communications between the user and the website relating to that pharmaceutical drug (*e.g.*, clicking the ad for the drug or searching for the drug on a DeepIntent-partnered website).

86. DeepIntent has boasted that, through its patented "Outcomes" platform, it can "increase script lift and boost business outcomes for marketers," and that it is able to reach up to "300 million patients based on different conditions or drugs they take."[26]

87. DeepIntent also uses location-based targeting to identify and target individuals and households based on where they live, move, and seek healthcare.

88. Through a partnership with Place Exchange, DeepIntent enables pharmaceutical advertisers to target digital out-of-home ("DOOH") screens at specific points of care, including pharmacies, medical centers, and other health-related venues, as well as to build custom "geofences" at specified geographic coordinates surrounding those locations.[27]

89. In a DeepIntent blog post on healthcare provider (HCP) engagement, DeepIntent explained that "geofencing allows marketers to target HCPs within a precise geographic radius on

---

[26] https://www.mmm-online.com/home/channel/deepintent-fine-tunes-tech-to-optimize-ad-campaigns-boost-script-lift/

[27] https://www.placeexchange.com/news/deepintent_partnership.

their mobile devices and laptops as they are traveling to or actively attending conferences," and highlighted healthcare "conference targeting" as one of its "top HCP engagement strategies."[28]

90. Through these practices, DeepIntent infers highly sensitive health information from a person's physical location. For example, when a user's device enters a geofenced perimeter around a specialty healthcare clinic that dispenses a particular prescription medication, DeepIntent and its advertiser clients can infer that the user is seeking or receiving treatment from that facility and can target or measure ads for that medication.

91. Regulators have recognized that geofencing around healthcare facilities is inherently privacy-invasive and can unlawfully reveal a person's health status. In 2017, the Massachusetts Attorney General entered into an assurance of discontinuance with Copley Advertising, an adtech firm that used geofencing around hospitals and reproductive health clinics to target patients with ads, finding that such practices unlawfully "reveal[ed] intimate medical or physical conditions" without consent.[29] More recently, Washington State passed the My Health My Data Act ("MHMDA"), which expressly prohibits the use of geofencing around facilities that provide in-person healthcare services, where the geofence is used to identify consumers seeking healthcare, collect consumer health data, or send ads related to consumers' health data or healthcare.

[28] https://deepintent.com/deepdive/why-conference-targeting-should-be-one-of-your-top-hcp-engagement-strategies

[29] https://www.mass.gov/news/ag-reaches-settlement-with-advertising-company-prohibiting-geofencing-around-massachusetts-healthcare-facilities

### C. DeepIntent Contemporaneously Intercepted Plaintiffs' Communications With Multiple Websites

92. As noted above, healthline.com is one of many websites that has integrated DeepIntent's Tracking Tools, including DeepIntent's CDIUSER cookie, pixel, and web beacons.

93. Healthline.com is a consumer health information website that publishes articles, guides, and reference materials on a wide range of health topics, including medical conditions and treatments. With an estimated 90 million visits per month, healthline.com is one of the most-visited health websites in the world.

94. Plaintiff Nina Harris has visited healthline.com to obtain information about personal health conditions.

95. Each time Plaintiff Nina Harris visited healthline.com, DeepIntent's Tracking Tools intercepted virtually every interaction between her and the website, including the contents of her communications in the form of URLs, the text of searches and queries on specific topics, and ad clicks, in addition to collecting information regarding the device types, browsers, operating systems, IP addresses, timestamps, and other technical identifiers associated with Plaintiff Nina Harris.

96. Neither the Terms of Service nor the Privacy Policies of healthline.com disclosed DeepIntent's "identity graph" and cross-device tracking.

97. After visiting healthline.com, Plaintiff Nina Harris received emails and targeted advertisements that mentioned the specific health conditions that she had searched for. Plaintiff Nina Harris received these targeted advertisements as soon as a day after visiting healthline.com.

98. Plaintiff Nina Harris would not have visited healthline.com if she knew that her personal and/or health data would be shared and/or sold.

99. As noted above, reachmd.com is another website that has integrated DeepIntent's Tracking Tools, including DeepIntent's CDIUSER cookie, pixel, and web beacons.

100. Reachmd.com is a website that provides medical news, expert commentary, and clinical updates across a wide range of medical specialties.

101. Plaintiff Nina Harris has visited reachmd.com to obtain information about a personal health condition.

102. Each time Plaintiff Nina Harris visited reachmd.com, DeepIntent's Tracking Tools intercepted virtually every interaction between Plaintiff Nina Harris and the website, including the contents of her communications in the form of URLs, the text of searches and queries on specific topics, and ad clicks, in addition to collecting information regarding device types, browsers, operating systems, IP addresses, timestamps, and other technical identifiers associated with Plaintiff Nina Harris.

103. Neither the Terms of Service nor the Privacy Policies of reachmd.com disclosed DeepIntent's "identity graph" and cross-device tracking.

104. After visiting reachmd.com, Plaintiff Nina Harris received emails and targeted advertisements that mentioned the specific health conditions that she had searched for. Plaintiff Nina Harris received these targeted advertisements as soon as a day after visiting reachmd.com.

105. Plaintiff Nina Harris would not have visited reachmd.com if she knew that her personal and/or health data would be shared and/or sold.

106. As noted above, ozempic.com is another website that has integrated DeepIntent's Tracking Tools, including DeepIntent's CDIUSER cookie, pixel, and web beacons.

107. Ozempic.com is the official website for Ozempic®, a prescription medication from the pharmaceutical company Novo Nordisk. Ozempic® is a drug used to manage Type 2 diabetes and is also used for chronic weight management in adults with obesity or overweight.

108. Plaintiffs have visited ozempic.com to obtain information regarding Ozempic®, including prescribing information and medication guides.

109. Each time Plaintiffs visited ozempic.com, DeepIntent's Tracking Tools intercepted virtually every interaction between Plaintiffs and the website, including the contents of their communications in the form of URLs, the text of searches and queries on specific topics, and ad clicks, in addition to collecting information regarding device types, browsers, operating systems, IP addresses, timestamps, and other technical identifiers associated with Plaintiff Nina Harris.

110. Neither the Terms of Service nor the Privacy Policies of ozempic.com disclosed DeepIntent's "identity graph" and cross-device tracking.

111. After visiting ozempic.com, Plaintiffs received emails and targeted advertisements that mentioned the specific health conditions that they had searched for. Plaintiffs received these targeted advertisements as soon as a day after visiting ozempic.com.

112. Plaintiffs would not have visited ozempic.com if they knew that their personal and/or health data would be shared and/or sold.

113. Plaintiffs did not consent or agree to DeepIntent's interception of their communications with these websites, which included sensitive, personally identifiable health-related information. In fact, Plaintiffs were entirely unaware of DeepIntent's existence or its use of its Tracking Tools when Plaintiffs visited these websites.

### D. Health-Related Data Is Particularly Sensitive

114. Information about a person's physical and mental health is among the most confidential and sensitive information in our society.

115. Individuals have a particular privacy interest in their health data not only because of the social stigma associated with certain health conditions, but also because of the direct financial implications which may accompany an insurance company learning information about one's health that the individual may not have intended to share.

116. As explained above, DeepIntent's Tracking Tools, which are integrated into a significant number of popular healthcare-related websites, allow DeepIntent to construct a longitudinal record of a person's online activity as it pertains to health, which can include that user's private health conditions and medical treatments.

117. DeepIntent claims to only collect de-identified data on users. However, DeepIntent's "identity graph" can result in individuals being re-identified, given that the entire purpose of its identity graph is to cohesively link multiple identifiers (*e.g.*, persistent identifiers, IP addresses, MAIDs, CTV IDs) together so that a particular individual can be associated with that particular individual's sensitive health data. When combined with unique health-related behaviors, an "anonymous" profile can become probabilistically linked to a real person. This is especially true given that certain medical conditions are extremely rare.

118. Thus, even if a user with such a condition were placed in a larger "audience" by DeepIntent, it would not be challenging to single that person out in the audience, especially with the wealth of other data collected by DeepIntent on that person. For example, a user with a rare form of cancer (gleaned from that user's browsing history and the text of their online search queries), in a specific location (based on IP address data), in a specific age range (based on data

obtained by DeepIntent from a third-party data broker) would be easy to identify, despite DeepIntent's claims of "de-identification."

119. Indeed, in a 2013 study conducted by MIT, in a dataset of 1.1 million people, researchers were able to identify individuals with 95% certainty using only 4 points of time-stamped location data, and with 100% certainty using 11 points of time-stamped location data.[30] This study clearly demonstrates the ease with which ostensibly pseudonymized data, like that surreptitiously collected by DeepIntent, can be used to identify and target a specific individual.

120. Moreover, DeepIntent's practice of measuring ad conversions in the healthcare context raises additional privacy concerns. Most patients would have no idea that seeing an ad for a prescription drug could later be connected to whether they filled a prescription for that drug. Indeed, making certain healthcare-related purchases is the type of information that consumers would reasonably expect to remain private and not form the basis of interest-based advertising.

### E. Plaintiffs and the Classes Did Not Consent to DeepIntent's Interception and Collection of their Data

121. Despite the widespread integration of DeepIntent's Tracking Tools on scores of health-related websites and the staggering amount of data that DeepIntent intercepts and collects on individual consumers – including sensitive health-related information – at no point does DeepIntent attempt to identify itself to end users on those websites.

122. DeepIntent makes no effort to obtain consent from consumers whose data it gathers, including Plaintiffs and Class Members (defined below). At no point during its process of collecting or processing personal information, the compiling of user profiles/audiences, or selling

[30] *See* "Unique in the Crowd: The privacy bounds of human mobility," Scientific Reports, published March 25, 2013 (available at https://www.nature.com/articles/srep01376).

services based on that personal information, does DeepIntent ever directly ask individuals for their consent.

123. Nor have Plaintiffs and Class Members manifested any form of consent even indirectly. DeepIntent publishes a so-called "Platform Privacy Policy" on its website,[31] but this policy is not reasonably directed to Plaintiffs and Class Members, all of whom lack any direct relationship with DeepIntent and have no reasonable insight into DeepIntent's data collection and data exploitation practices or how they may or may not be subject to such practices. Plaintiffs have never affirmatively agreed to any such policy.

124. In fact, DeepIntent does not even require its connected publishers (i.e., those that have installed DeepIntent's various Tracking Tools) to inform consumers that they are utilizing DeepIntent's Tracking Tools. Similarly, consumers would have no way of knowing that merely appearing near a healthcare facility could trigger DeepIntent's tracking and targeting through geofencing.

125. Therefore, there is no reasonable basis upon which Plaintiffs and Class Members would be aware of DeepIntent's privacy policies. Plaintiffs and Class Members are not legally subject to or governed by DeepIntent's published privacy policies.

126. As its privacy policy demonstrates, DeepIntent relies heavily on permissions purportedly provided by users on third-party websites (i.e., those websites which host DeepIntent's Tracking Tools) as the supposed legal basis for its data collection on individuals. For example, DeepIntent discloses in its Privacy Policy that it may collect "GPS-level location information and precise geolocation" from website and app publishers, but that those publishers "are responsible

---

[31] *See* DeepIntent "Platform Privacy Policy," available at https://start.deepintent.com/platform-privacy-policy (last accessed Oct. 26, 2025).

for obtaining [users'] permission to do so." However, health-related websites that have integrated DeepIntent's Tracking Tools do not require consumers to view (through a link or otherwise), let alone agree to, DeepIntent's privacy policies. In fact, consumers are generally entirely unaware of the existence or function of DeepIntent itself.

127. Plaintiffs and Class Members cannot reasonably foresee all the ways in which DeepIntent may use the detailed profiles it is compiling on them. Plaintiffs and Class Members have no way of knowing the specific third parties to which DeepIntent will provide their healthcare-related information, or what those third parties will do with that information. Plaintiffs and Class Members thus cannot provide knowing and informed consent to DeepIntent's dissemination of their personal information.

128. Neither DeepIntent's so-called privacy policies nor the policies of third-party publishers could provide any reasonable basis for Plaintiffs and Class Members to have consented to DeepIntent's data collection, compiling of digital profiles, and other data exploitation practices, let alone to have waived their privacy rights, including to be free from DeepIntent's pervasive surveillance of them.

**F. Plaintiffs' and the Class Members' Data Is Valuable**

129. Each of the Plaintiffs' and the Class Members' data has monetary value.

130. Some individuals have previously been compensated for their personal data by participating in surveys.

131. Others paid for services like VPNs and/or premium subscriptions to avoid tracking.

132. As of 2023, online advertising was estimated to be a $200 billion industry.

133. Unique identifiers and other personally identifiable information are extremely valuable to advertisers who use this information to identify and target specific individuals. Data

brokers, such as DeepIntent, routinely sell access to this type of information precisely for this reason.

134. For instance, Datasys currently advertises a dataset of 10 million hashed emails (using common techniques, including SHA) for $5,000 a month.[32] Another dataset, offered by the company Irys, is specifically advertised as "identity data" containing device IDs, hashed emails, IP address, country code, and timestamps.[33] A similar dataset, offered by Stirista, likewise contains hashed email addresses and IP addresses, among other PII, and retails for $9,500 a month or $114,000 a year.[34]

135. The data DeepIntent intercepts and maintains about Plaintiffs and Class Members is *especially* valuable in light of the other private data accompanied by it, including users' searches and queries through their browsing activity. Companies regularly trade in this type of data, with some companies, like Google and Reklaim, paying consumers to access this data directly.[35]

136. In addition, various studies have valued individual personal data at hundreds of dollars per record.

137. For example, a 2020 study published by the National Library of Medicine estimates that an individual's personal data is worth approximately $200 per record containing personal information.[36]

---

[32] Datasys, *Email Address Data | USA Coverage*, https://data.datasys.com/products/datastream-group-opt-in-intent-keyword-search-data-usa-datasys

[33] Irys, *Identity Data | Asia Pacific | Hashed Emails with Device Metadata*, Datarade, https://datarade.ai/data-products/identity-data-asia-pacific-hashed-emails-with-device-meta-irys

[34] Stirista, *Email Address Data | Email Database | US Consumers (564 Million),* Datarade, https://datarade.ai/data-products/email-address-data-email-database-us-consumers-564-milli-stirista

[35] Ipsos, *Google Screenwise Panel*, https://screenwisepanel.com/; Reklaim, Reklaim – Take Back What's Yours, https://www.reklaimyours.com/.

[36] *See* Valuing Personal Data with Privacy Consideration - PMC, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8562626.

138. Another study from 2023 estimates that a single email address can be worth $89.[37]

139. Medical data is even more valuable than standard personal data. Indeed, some studies estimate that medical data is worth ten times more than credit card information.[38]

140. DeepIntent's primary purpose for surreptitiously intercepting and collecting consumers' personal and health information is to profit from selling that data.

## V. CLASS ALLEGATIONS

141. **Class Definition**: Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class:

> All persons in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was collected and used by DeepIntent.

142. **California Subclass**: Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All California residents whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was collected and used by DeepIntent.

143. The Class and the California Subclass shall be collectively referred to as the "Classes," and Members of the Class and California Subclass shall be collectively referred to as "Class Members," unless it is necessary to differentiate them.

144. Excluded from the Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or

[37] *See* Is personally identifiable information really more valuable? Evidence from consumers' willingness-to-accept valuation of their privacy information, *available at* https://www.sciencedirect.com/science/article/abs/pii/S0167923623000854?via%3Dihub.

[38] *See, e.g.*, The Value of Personal Medical Information: Protecting Against Data Breaches, *available at* https://www.naham.org/page/ConnectionsThe-Value-Of-Personal-Medical-Information.

employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

145. Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

146. This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23.

147. **Numerosity**: Each Class is so numerous that joinder of all members is impracticable. Upon information and belief, Class Members number in the millions.

148. **Commonality**: There are questions of law or fact common to the Classes. These questions include, but are not limited to, the following:

a. Whether DeepIntent's acts and practices violated California's Constitution, Art. 1, § 1,

b. Whether DeepIntent's acts and practices violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*;

c. Whether DeepIntent's acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*;

d. Whether DeepIntent's acts and practices violated the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*;

e. Whether DeepIntent sought or obtained prior consent from Plaintiffs and Class Members;

f. Whether DeepIntent was unjustly enriched as a result of its violations of Plaintiffs' and Class Members' privacy rights; and

g. Whether declaratory relief should be granted.

149. **Typicality**: Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs and the Class Members did not consent to DeepIntent's interception, collection, analysis, and sale of their personal information, which acts form the basis for this suit.

150. **Adequacy**: Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

151. **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action. Plaintiffs know of no special difficulty that would be encountered by litigating this action that would preclude its maintenance as a class action.

## VI. CAUSES OF ACTION

### COUNT I
**Violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.***
**(on behalf of Plaintiffs and the California Subclass)**

152. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

153. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

#### A. Wiretapping – Cal. Penal Code § 631

154. CIPA § 631 provides (in part) that it shall be unlawful for "[a]ny person" who, "by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit[.]"

155. DeepIntent is a "person" within the meaning of CIPA § 631.

156. The following items constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, DeepIntent's deliberate and purposeful scheme that facilitated its interceptions falls under the broad statutory category of "any other manner":

a. DeepIntent's Tracking Tools and/or other similar computer codes and programs designed to intercept, collect, transmit, and track consumers' private information;

b. Plaintiffs' and California Subclass Members' browsers;

c. Plaintiffs' and California Subclass Members' computing and mobile devices; and

d. The plan DeepIntent carried out to effectuate its tracking and interception of consumers' private information and communications while browsing the Internet.

157. DeepIntent's Tracking Tools and/or other similar computer codes and programs contemporaneously and surreptitiously intercepted the contents of Plaintiffs' and California Subclass Members' electronic communications with websites while those communications were in transit and secretly sent them to DeepIntent, as described in Section IV.B. above. The contents of Plaintiffs' and the California Subclass Members' communications that DeepIntent intercepted includes, among other things, the precise URL of each article and webpage visited, as well as the exact search queries input on those websites.

158. DeepIntent read, attempted to read, learned, or attempted to learn the meaning of the contents of Plaintiffs' and the California Subclass Members' communications exchanged with websites they visited. For example, DeepIntent used the URLs and search queries inputted in these websites to group users into specific segments of users for advertising purposes (e.g., "21-30 year olds with asthma who live in California and have an active lifestyle," or "people with asthma"). Indeed, DeepIntent intended to read and understand this data because it built an entire system capable of reading and understanding the data and then categorizing the substance of this user health data for the purpose of monetizing it.

159. DeepIntent did not have the prior consent of all parties to learn the contents of or record the communications at issue, as Plaintiffs and California Subclass Members did not provide express prior consent to DeepIntent's interception of their communications with websites.

160. Moreover, DeepIntent intended to spy on Plaintiffs and the California Subclass Members and collect their personal information without consent or compensation. In doing so,

DeepIntent stole from Plaintiffs and the California Subclass Members information for which DeepIntent would otherwise have to pay Plaintiffs and the California Subclass Members.

161. The wiretapping of Plaintiffs and California Subclass Members occurred in California, where Plaintiffs and California Subclass Members accessed the websites, where DeepIntent's cookies and web beacons/pixels were loaded on Plaintiffs' and California Subclass Members' browsers, and where DeepIntent routed Plaintiffs' and California Subclass Members' electronic communications to DeepIntent's servers.

162. Plaintiffs and California Subclass Members have suffered loss by reason of these violations, including, but not limited to, violations of their rights to privacy, loss of value in their personally identifiable information, and profiting off of their personal information without compensation.

163. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by the violations of Cal. Penal Code § 631, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**B. Pen register – Cal. Penal Code § 638.51**

164. CIPA § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

165. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

166. Courts have repeatedly recognized that in the Internet era, pen registers can take the form of software and, as a result, private companies and persons have the ability to gather the

same electronic information as law enforcement. The California legislature does not limit its prohibition on installing pen registers to law enforcement.

167. DeepIntent's Tracking Tools and/or other similar computer codes and programs, as described in Section IV.B. above, constitute "pen registers" because they are "devices" or "processes" that "record" "addressing or signaling information"—such as Plaintiffs' and California Subclass Members' IP addresses, device type, browser information, operating systems, and timestamps—from the electronic communications transmitted by users' internet-connected devices. DeepIntent's Tracking Tools and/or other similar computer codes and programs use this signaling information to identify consumers, gather their data, and correlate that data (*i.e.*, use that data to group consumers into specific segments).

168. Plaintiffs did not consent to DeepIntent collecting or using this information.

169. DeepIntent was not authorized by any court order to use a pen register to record Plaintiffs' and California Subclass Members' routing, addressing, or signaling information.

170. As a direct and proximate result of DeepIntent's conduct, Plaintiffs and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

171. At all relevant times, DeepIntent's conduct alleged herein was without the authorization and consent of Plaintiffs and California Subclass Members.

172. Unless enjoined, DeepIntent will continue to commit the violations of law alleged here.

173. Plaintiffs and California Subclass Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**COUNT II**
**Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Class)**

174. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

175. Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

176. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA") prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

177. The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

178. The ECPA protects both the sending and receipt of communications.

179. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA. 18 U.S.C. § 2520(a).

180. DeepIntent intentionally intercepted electronic communications that Plaintiffs and Class Members exchanged with websites by tracking individuals while they were browsing the internet through the direct placement and utilization of its Tracking Tools and/or computer code and programs on websites, as described herein at Section IV.B. above.

181. DeepIntent's interception of Internet communications that Plaintiffs and Class Members were sending and receiving was done contemporaneously with the sending and receipt of those communications. Specifically, and as described in Section IV.B. above, DeepIntent sets

its CDIUSER cookie and web beacons/pixels on websites such that DeepIntent captures and transmits information as an individual navigates through webpages on which it is present.

182. On information and belief, DeepIntent has used these trackers to intercept the contents of Plaintiffs' and Class Members' communications, including but not limited to the precise URL of each article and webpage visited by Plaintiffs, as well as the exact search queries inputted by Plaintiffs on those websites.

183. The transmission of data between Plaintiffs and Class Members on the one hand and the websites on which DeepIntent tracked and intercepted their communications on the other, without authorization were "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

184. The following instruments constitute "devices" within the meaning of the ECPA:

a. DeepIntent's Tracking Tools and/or other similar computer code and programs designed to intercept, collect, transmit, and track consumers' private information;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing and mobile devices; and

d. The plan DeepIntent carried out to effectuate its tracking and interception of consumers' private information and communications while browsing the Internet.

185. DeepIntent, in its conduct alleged here, was not providing an "electronic communication service," as that term is defined in 18 U.S.C. § 2510(15) and is used elsewhere in the Wiretap Act. DeepIntent was not acting as an Internet Service Provider (ISP).

186. As described above, the communications between Plaintiffs and Class Members, on the one hand, and websites on the other, were simultaneous to, but separate from, the channel through which DeepIntent acquired the contents of those communications.

187. DeepIntent was not a party to these communications because Plaintiffs and Class Members were unaware of DeepIntent's interception of their communications with websites, and Plaintiffs and Class Members did not knowingly send any communication to DeepIntent. DeepIntent could not manufacture its own status as a party to Plaintiffs' and Class Members' communications with websites and apps by surreptitiously intercepting those communications.

188. Plaintiffs and Class Members were unaware of, and did not consent to, DeepIntent's acquisition of their communications with the websites they visited, as described above. DeepIntent did not obtain legal authorization to obtain Plaintiffs' and Class Members' communications with the websites they visited. Any purported consent that DeepIntent received from websites to obtain Plaintiffs' and Class Members' communications was not valid.

189. DeepIntent's interception of Plaintiffs' and Class Members' communications was done for purposes of committing criminal and tortious acts, including violations of CIPA; Article I, Section 1 of California's constitution; the California Unfair Competition Law; a knowing intrusion on Plaintiffs' and California Subclass Members' seclusion; and to spy on Plaintiffs and Class Members and collect their personal information without consent or compensation. In doing so, DeepIntent stole from Plaintiffs and the Class Members information for which DeepIntent would otherwise have to pay them.

190. For DeepIntent's violations set forth above, Plaintiffs and Class Members seek appropriate equitable or declaratory relief, including injunctive relief, actual damages and "any profits made by [DeepIntent] as a result" of its violations or the appropriate statutory measure of

damages; punitive damages in an amount to be determined by a jury; and reasonable attorneys' fees and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

191. Unless enjoined, DeepIntent will continue to commit the violations of law alleged here.

192. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members seek monetary damages for the greater of (i) the sum of the actual damages suffered by Plaintiffs and Class Members and any profits made by DeepIntent as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**COUNT III**
**Invasion of Privacy Under Article I, Section 1 of the California Constitution**
**(on behalf of Plaintiffs and the California Subclass)**

193. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

194. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

195. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, Section 1.

196. The right to privacy in California's Constitution creates a right of action against private and government entities.

197. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and

(3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

198. Plaintiffs and California Subclass Members have and continue to have a reasonable expectation of privacy in their health-related personal information and web activity.

199. Plaintiffs and California Subclass Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by DeepIntent included Plaintiffs' and California Subclass Members' personal, sensitive health-related information; and (ii) Plaintiffs and California Subclass Members did not consent or otherwise authorize DeepIntent to collect and use this private information.

200. Plaintiffs and California Subclass Members had a reasonable expectation of privacy that their communications, identities, and sensitive health-related personal information would remain private and that DeepIntent would not install surreptitious technologies on health-related websites to secretly intercept and transmit their communications to third parties, including advertisers and ad agencies.

201. In violation of Plaintiffs' and California Subclass Members' reasonable expectation of privacy, DeepIntent intercepts, collects, tracks, and compiles their internet activity and communications, and makes access to that data available for sale. This information includes Plaintiffs' and California Subclass Members' location data and web browsing information, including sensitive health-related information. Such information is "personal information" under California law. *See* Cal. Civ. Code § 1798.140 (defining personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement.").

202. DeepIntent has violated Plaintiffs' and California Subclass Members' reasonable expectation of privacy by surreptitiously intercepting and amassing information reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives into profiles for future or present use. In addition, those profiles are and can be used to further invade Plaintiffs' and California Subclass Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising purposes, as described herein, thereby harming them by selling this data to advertisers without their consent.

203. Given the sensitive nature of the health-related information that DeepIntent intercepted and collected, including information concerning users' health conditions and medications/treatments, DeepIntent's conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

204. DeepIntent's interception and amassment of electronic communications reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives is highly offensive to a reasonable person, and constitutes an unreasonable, substantial, and serious interference with Plaintiffs' and California Subclass Members' rights to privacy.

205. In addition, DeepIntent's violations of various state and federal statutes (as described herein) are an independent and egregious breach of social norms.

206. At a minimum, DeepIntent's invasion of privacy harmed Plaintiffs and California Subclass Members in the following ways:

a. Sensitive and confidential health-related information that Plaintiffs and California Subclass Members intended to remain private is no longer private;

b. DeepIntent took something of value from Plaintiffs and California Subclass Members and derived benefit therefrom without Plaintiffs' and California Subclass

Members' knowledge or informed consent and without sharing the benefit of such value;

c. DeepIntent's actions diminished the value of Plaintiffs' and California Subclass Members' personal information.

207. Plaintiffs and California Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of DeepIntent's actions, which caused injury to Plaintiffs and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter DeepIntent from engaging in such conduct in the future.

**COUNT IV**
**Intrusion Upon Seclusion Under California Common Law**
**(on behalf of Plaintiffs and the California Subclass)**

208. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

209. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

210. A plaintiff asserting a claim for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

211. In violation of Plaintiffs' and California Subclass Members' reasonable expectation of privacy, DeepIntent intercepts, collects, tracks, and compiles their internet activity and communications, and makes access to that data available for sale. This information includes Plaintiffs' and California Subclass Members' location data and web browsing information, including sensitive health-related information. Such information is "personal information" under California law. *See* Cal. Civ. Code § 1798.140 (defining personal information as including

"Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement.").

212. DeepIntent has violated Plaintiffs' and California Subclass Members' reasonable expectation of privacy by surreptitiously intercepting and amassing information reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives into profiles for future or present use. In addition, those profiles are and can be used to further invade Plaintiffs' and California Subclass Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers without their consent.

213. Further, the extent of DeepIntent's intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and California Subclass Members' personal information with potentially countless third parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity.

214. Given the sensitive nature of the health-related information that DeepIntent intercepted and collected, including information concerning users' medical conditions and medications/treatments, DeepIntent's conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

215. DeepIntent's interception and amassment of electronic communications reflecting the healthcare-related activities and choices of Plaintiffs' and California Subclass Members' lives is highly offensive to a reasonable person, and constitutes an unreasonable, substantial, and serious interference with Plaintiffs' and California Subclass Members' rights to privacy.

216. In addition, DeepIntent's violations of various state and federal statutes (as described herein) are an independent and egregious breach of social norms.

217. DeepIntent lacks a legitimate business interest in stockpiling and compiling the personal, healthcare-related information of Plaintiffs and California Subclass Members.

218. Plaintiffs and California Subclass Members have been damaged by DeepIntent's invasion of their privacy and are entitled to just compensation and injunctive relief.

219. As a result of DeepIntent's actions, Plaintiffs and California Subclass Members seek injunctive relief in the form of DeepIntent's cessation of tracking practices in violation of Plaintiffs' and California Subclass Members' rights, and destruction of all personal information obtained in violation of Plaintiffs' and California Subclass Members' rights.

220. As a result of DeepIntent's actions, Plaintiffs and California Subclass Members seek nominal and punitive damages in an amount to be determined at trial. Plaintiffs and California Subclass Members seek punitive damages because DeepIntent's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and California Subclass Members and made in conscious disregard of their rights. Punitive damages are warranted to deter DeepIntent from engaging in future misconduct.

221. Plaintiffs and California Subclass Members seek restitution for the unjust enrichment obtained by DeepIntent as a result of unlawfully collecting Plaintiffs' and California Subclass Members' personal information.

**COUNT V**
**Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)**
**(on behalf of Plaintiffs and the California Subclass)**

222. Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth herein.

223. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant pursuant to the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unfair and unlawful business acts or practices.

224. Plaintiffs are "persons" within the meaning of Cal. Bus. & Prof. Code § 17201.

225. DeepIntent is a "business" within the meaning of Cal. Bus. & Prof. Code § 17201.

226. DeepIntent engaged in both unfair and unlawful business practices in violation of the UCL by unlawfully intercepting and collecting massive amounts of sensitive, personally identifiable health information of consumers and patients of numerous healthcare industry companies across the country.

227. DeepIntent willfully engaged in these unfair and unlawful acts and practices and knew or should have known that these acts and practices were unfair and unlawful in violation of the UCL.

***DeepIntent's Unfair Business Acts and Practices***

228. Under the UCL, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers or violates a legislatively declared policy constitutes an unfair business act or practice.

229. DeepIntent's affirmative acts in intercepting and collecting Plaintiffs' and the California Subclass's sensitive, personally identifiable health information are unfair within the meaning of the UCL because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers and businesses, and did not benefit consumers or competition.

230. These affirmative acts were also unfair within the meaning of the UCL because this conduct undermined California public policy that businesses protect personal and financial

information as reflected in Article I, Section 1 of the California Constitution, which states that all persons have an inalienable right to privacy and was enacted to protect consumers from violations of these rights by private sector data processing activity, and other California statutes. *See* Online Privacy Protection Act, Cal. Bus. & Prof. Code § 22578 (explaining that the Legislature intended to have a uniform policy statewide regarding privacy policies on the internet); the Information Practices Act, Cal. Civ. Code § 1798.1 ("The Legislature declares that … all individuals have a right to privacy in information pertaining to them … The increasing use of computers … has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); and Cal Civ. Code § 1798.81.5(a)(1) ("It is the intent of the Legislature to ensure that personal information about California residents is protected.").

231. DeepIntent also engaged in unfair competition by failing to disclose, and omitting material information about, its data tracking practices. Plaintiffs and California Subclass members relied on these omissions to their detriment by using websites through which DeepIntent surreptitiously intercepted and collected their personal, sensitive information.

***DeepIntent's Unlawful Business Acts and Practices***

232. The violation of any law constitutes an unlawful business practice under the UCL.

233. As detailed above, DeepIntent has violated CIPA; ECPA; the California Constitution Article I, Section 1; and California common law for intrusion upon seclusion. These unlawful acts also provide an independent basis for DeepIntent's violation of the UCL.

***DeepIntent's Business Acts and Practices Harmed Competition and Caused Injury and Losses to Plaintiffs and the California Subclass***

234. DeepIntent's conduct harmed competition. While DeepIntent failed to disclose its practices and minimized costs, its competitors spent the time and money necessary to lawfully collect information. Further, the injuries suffered by Plaintiffs and the California Subclass

Members are not outweighed by any countervailing benefits to consumers or competition. There is no way Plaintiffs and California Subclass Members could have known about DeepIntent's practices or avoided the injuries they sustained because DeepIntent never disclosed its practices or obtained consent from Plaintiffs and California Subclass Members.

235. DeepIntent's unlawful and unfair business practices have caused Plaintiffs and the California Subclass Members to suffer economic injury. Due to the nature of DeepIntent's wrongdoing, these injuries and losses will continue.

236. These injuries and losses are the direct and proximate result of DeepIntent's violations of the UCL, and Plaintiffs and the California Subclass Members are entitled to equitable and such other relief as this Court considers necessary and proper.

**COUNT VI**
**Declaratory Judgment**
**(on behalf of Plaintiffs and the Class)**

237. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

238. Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

239. The gravamen of this controversy lies in DeepIntent's collection, tracking, and analysis of Plaintiffs' and Class Members' personal information and behavior, building dossiers based on that information, and providing access to that information to third parties. Plaintiffs and Class Members never consented to, or were even aware of, DeepIntent's conduct described herein.

240. DeepIntent's misconduct has put Plaintiffs' and Class Members' privacy and autonomy at risk, and violated their dignitary rights, privacy, and economic well-being.

241. Accordingly, Plaintiffs seek appropriate declaratory relief, and injunctive relief as prayed for below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Issue an order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives, that Plaintiffs' attorneys shall be appointed as counsel for the Class and the California Subclass pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that class notice be promptly issued;

b. Certify this action is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

c. Appoint Plaintiffs to represent the Class and California Subclass;

d. Appoint undersigned counsel to represent the Class and California Subclass;

e. Enter judgment in favor of Plaintiffs and Class Members against DeepIntent awarding damages, including compensatory damages, punitive damages, and/or nominal damages, to Plaintiffs and Class Members, in an amount according to proof at trial, including interest thereon;

f. Enter judgment in favor of Plaintiffs and Class Members against DeepIntent awarding restitution of DeepIntent's ill-gotten gains, revenues, earnings, or profits that it derived, in whole or in part, from its unlawful collection and use of Class Members' personal information, in an amount according to proof at trial;

g. Enter declaratory judgment in favor of Plaintiffs and Class Members against DeepIntent pursuant to 28 U.S.C. § 2201 declaring that DeepIntent's conduct is unlawful as alleged herein;

h. Permanently restrain DeepIntent, and its officers, agents, servants, employees, and attorneys, from intercepting, tracking, collecting, or compiling the personal information of Class Members as alleged herein;

i. Award Plaintiffs and Class Members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

j. Grant Plaintiffs and Class Members further equitable, injunctive, declaratory, or other relief as the Court deems appropriate.

## VII. JURY DEMAND

242. Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: March 19, 2026

*/s/ Adam M. Harris*

Adam M. Harris
Andrew Cauchi
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, New York 10004
Tel.: 212-350-8850
adam.harris@davidllc.com
andrew.cauchi@davidllc.com

Michael Acciavatti (*pro hac vice*)
**MILBERG, PLLC**
405 East 50th Street
New York, New York 10022
Tel.: 212-594-5300
macciavatti@milberg.com

*Attorneys for Plaintiffs Nina Harris, Gerald Harris, and the Classes*