**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NINA HARRIS and GERALD HARRIS, individually and on behalf of all those similarly situated,

Plaintiffs,

v.

DEEPINTENT TECHNOLOGIES, INC.

Defendant.

Case No. 1:25-cv-08949-RA

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DEEPINTENT TECHNOLOGIES, INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 3

ARGUMENT .......... 5

I. PLAINTIFFS HAVE ARTICLE III STANDING .......... 5

A. Plaintiffs Have Pleaded a Concrete Privacy Injury .......... 5

B. Plaintiffs' Injuries Have Close Historical and Common-Law Analogs .......... 8

C. Plaintiffs Have Independently Pleaded Economic Injury .......... 10

II. PLAINTIFFS HAVE STATED A CLAIM UNDER CIPA § 631 .......... 12

III. PLAINTIFFS HAVE STATED A CLAIM UNDER CIPA § 638.51 .......... 16

IV. PLAINTIFFS HAVE STATED A CLAIM UNDER THE ECPA .......... 18

V. PLAINTIFFS HAVE STATED CLAIMS FOR INTRUSION UPON SECLUSION AND VIOLATION OF THE CALIFORNIA CONSTITUTIONAL RIGHT TO PRIVACY .......... 20

VI. PLAINTIFFS HAVE STATED A CLAIM UNDER CALIFORNIA'S UCL .......... 24

VII. PLAINTIFFS MAY PURSUE DECLARATORY RELIEF .......... 26

VIII. MR. HARRIS HAS ADEQUATELY PLEADED HIS CLAIMS .......... 26

CONCLUSION .......... 29

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Archer v. United Rentals, Inc.*,
195 Cal. App. 4th 807 (2011) ........ 25

*B.K. v. Eisenhower Med. Ctr.*,
721 F. Supp. 3d 1056 (C.D. Cal. 2024) ........ 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 28

*Beltran v. Doctors Med. Ctr. of Modesto*,
2025 WL 1635467 (E.D. Cal. June 9, 2025) ........ 23, 27

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ........ *passim*

*C.M. v. MarinHealth Medical Grp., Inc.*,
2024 WL 217841 (N.D. Cal. Jan. 19, 2024) ........ 7

*Camacho v. Auto. Club of S. Cal.*,
142 Cal. App. 4th 1394 (2006) ........ 25

*Carter v. HealthPort Tech., LLC*,
822 F.3d 47 (2d Cir. 2016) ........ 5

*Casillas v. Transitions Optical, Inc.*,
2024 WL 4873370 (Cal. Super. Ct. Sept. 9, 2024) ........ 17

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) ........ 23

*Cousin v. Sharp Healthcare*,
702 F. Supp. 3d 967 (S.D. Cal. 2023) ........ 23

*D'Angelo v. Penny OpCo, LLC*,
2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) ........ 14

*D'Antonio v. Cable News Network, Inc.*,
2026 WL 960032 (S.D.N.Y. Apr. 9, 2026) ........ 7, 17

*Doe v. Eating Recovery Ctr. LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ........ 15, 20

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ........ 18

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) ........ 24

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) ........ 16

*Gabrielli v. Insider, Inc.*,
2025 WL 522515 (S.D.N.Y. Feb. 18, 2025) ........ 8, 17

*Gabrielli v. Motorola Mobility, LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) ........ 20

*Gaige v. Exer Holding Co.*,
2025 WL 559719 (C.D. Cal. Mar. 2, 2025) ........ 8

*Garon v. Keleops USA, Inc.*,
2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) ........ 17

*Gilligan v. Experian Data Corp.*,
2026 WL 32259 (N.D. Cal. Jan. 6, 2026) ........ 22

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ........ 16

*Greenstein v. Noblr Reciprocal Exch.*,
585 F. Supp. 3d 1220 (N.D. Cal. 2022) ........ 11

*Harrill v. Emanuel Med. Ctr.*,
2025 WL 1635428 (E.D. Cal. June 9, 2025) ........ 22, 23, 27

*Hayden v. Retail Equation, Inc.*,
2022 WL 2254461 (C.D. Cal. May 4, 2022) ........ 21

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ........ 6

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ........ 20

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) ........ 22

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ *passim*

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 11, 20

*In re Google Assistant Priv. Litig.*,
546 F. Supp. 3d 945 (N.D. Cal. 2021) .......... 25

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 13

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) .......... 18

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) .......... 13

*In re Meta Android Priv. Litig.*,
2026 WL 1279416 (N.D. Cal. May 11, 2026) .......... 20

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 21

*In re USA Today Co., Inc. Internet Tracking Litig.*,
2026 WL 932655 (N.D. Cal. Apr. 6, 2026) .......... 6

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 13

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 21

*Krzyzek v. OpenX Techs., Inc.*,
817 F. Supp. 3d 857 (N.D. Cal. 2026) .......... 9, 21

*Kwikset Corp. v. Super. Ct.*,
51 Cal. 4th 310 (2011) .......... 24

*Lewis v. Magnite, Inc.*,
2025 WL 3687546 (C.D. Cal. Dec. 4, 2025) .......... 27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 5

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020) .......... 28

*Maghoney v. Dotdash Meredith, Inc.*,
2026 WL 497402 (S.D. Cal. Feb. 23, 2026) .......... 7

*Manier v. Triple Lift Inc.*,
2026 WL 1295546 (C.D. Cal. Apr. 15, 2026) .......... 25

*Mata v. Zillow Grp., Inc.*,
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) ........ 13

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ........ 16

*McDonald v. Kiloo ApS*,
385 F. Supp. 3d 1022 (N.D. Cal. 2019) ........ 24

*Mirmalek v. L.A. Times Commc'ns LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ........ 16

*Mount v. PulsePoint, Inc.*,
684 F. App'x 32 (2d Cir. 2017) ........ 9

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) ........ 22, 23

*Owens v. Smith, Gambrell & Russell Int'l, LLP*,
2024 WL 3914663 (C.D. Cal. May 30, 2024) ........ 11

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ........ 23

*Pruchnicki v. Envision Healthcare Corp.*,
845 F. App'x 613 (9th Cir. 2021) ........ 25

*R.C. v. Sussex Publishers, LLC*,
2025 WL 1735994 (N.D. Cal. June 23, 2025) ........ 14

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ........ 10

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ........ 13

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ........ *passim*

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) ........ 26

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ........ 9

*Sanchez v. Cars.com Inc.*,
2025 WL 487194 (Cal. Super. Ct. Jan. 27, 2025) ........ 17

*Selby v. Sovrn Holdings, Inc.*,
2025 WL 2950164 (N.D. Cal. Oct. 17, 2025)........................................................ 13, 14, 22

*Semien v. PubMatic Inc.*,
2026 WL 216333 (N.D. Cal. Jan. 27, 2026) ...................................................... 13, 14, 16, 27

*Shah v. Fandom Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) ............................................................................... 16

*Sisti v. Bosley, Inc.*,
2026 WL 1223927 (C.D. Cal. Apr. 27, 2026) ..................................................................... 12

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ........................................................................................... 10

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 2210002 (N.D. Cal. Aug. 4, 2025) ...................................................................... 19

*Tantaros v. Fox News Network, LLC*,
2018 WL 2731268 (S.D.N.Y. May 18, 2018) ..................................................................... 18

*Tash v. Vision Servs. Plan*,
2026 WL 1012680 (E.D. Cal. Apr. 14, 2026)...................................................................... 12

*Thomas v. Papa John's Int'l*,
2024 WL 2060140 (S.D. Cal. May 8, 2024)........................................................................ 21

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) ............................................................... 14, 15

*Toy v. Life Line Screening of Am., Ltd.*,
2024 WL 1701263 (N.D. Cal. Mar. 19, 2024)..................................................................... 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)........................................................................................................... 8, 9

*Wright v. TrueCare Prop. Holdings, LLC*,
2025 WL 3248749 (S.D. Cal. Nov. 21, 2025) ..................................................................... 23

*Xu v. Reuters News & Media Inc.*,
2025 WL 488501 (S.D.N.Y. Feb. 13, 2025)........................................................................... 8

**Statutes**

18 U.S.C. § 2511 ............................................................................................................. 2, 18

Cal. Bus. & Prof. Code
§ 17200 .......... 2, 24
§ 17204 .......... 3, 24, 25

Cal. Penal Code
§ 631(a) .......... *passim*
§ 638.51 .......... *passim*

**Rules**

9th Cir. R. 36–3 .......... 10

Fed. R. Civ. P. 15(a) .......... 26

Plaintiffs Nina Harris and Gerald Harris ("Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss filed by Defendant DeepIntent Technologies, Inc. ("DeepIntent") (ECF No. 41) (the "Motion" or "MTD").[1]

## PRELIMINARY STATEMENT

Plaintiffs' Complaint meticulously documents how DeepIntent surreptitiously intercepts the sensitive health-related communications of millions of Americans. DeepIntent's Motion to Dismiss fails because it misstates Plaintiffs' allegations, ignores controlling authority, and asks the Court to resolve factual disputes in DeepIntent's favor.

*First*, Plaintiffs have Article III standing. Their injuries map onto two intangible harms the Supreme Court endorsed in *TransUnion*—intrusion upon seclusion and disclosure of private information—and Plaintiffs independently allege economic injury from the diminished value of their health-related data.

*Second*, Plaintiffs sufficiently plead wiretapping under the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631(a). Plaintiffs allege that DeepIntent intercepted the contents of Plaintiffs' communications—including full-string URLs and search-query text revealing their sensitive health information—and read their substantive meaning in real time in order to sort users into condition-specific audiences and sell access to those audiences. That is interception of contents "in transit," not the passive storing or filtering DeepIntent describes.

*Third*, Plaintiffs adequately allege that DeepIntent operated an unlawful pen register in violation of CIPA, Cal. Penal Code § 638.51. DeepIntent's tracking tools are software "process[es]" that capture the addressing and signaling information transmitted by users'

[1] "¶" and "¶¶" refer to paragraphs of Plaintiffs' Amended Complaint (ECF No. 28) (the "Complaint").

devices—persistent CDIUSER identifiers, synced cross-partner cookies, and device and routing data used to link users' activity across the web—which is precisely what the statute reaches. DeepIntent's contrary reading would confine § 638.51 to antiquated telephone technology and carve out a loophole for modern, private ad-tech surveillance. At best, DeepIntent's argument raises fact questions about the breadth of the data it captured that cannot be resolved at this stage.

*Fourth*, Plaintiffs state a claim for a violation of the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. § 2511. DeepIntent's ECPA argument hinges on the faulty proposition that a website operator's consent to install tracking code on its servers can extinguish the privacy rights of millions of individuals who visited those websites and never agreed to DeepIntent receiving their sensitive health-related information. These websites' generalized consent to host DeepIntent's tracking code does not establish consent to the specific collection at issue, and, in any event, the crime-tort exception applies because DeepIntent's purpose was the independently tortious commercial exploitation of that data through profiling and sale.

*Fifth*, Plaintiffs state claims for intrusion upon seclusion and violation of the right to privacy under the California Constitution. Putting aside that these are questions ill-suited for a Rule 12(b)(6) motion, the Complaint sufficiently alleges Plaintiffs' reasonable expectation of privacy in their aggregated activity on health-related websites, and that DeepIntent's covert compilation and sale of per-person health profiles is highly offensive.

*Sixth*, Plaintiffs state a claim pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, under both its "unlawful" and "unfair" prongs—the former through the predicate CIPA, ECPA, constitutional, and common-law violations described above, and the latter because DeepIntent's covert recording and monetization of individuals' health data inflicts substantial, unavoidable consumer injury that no countervailing benefit outweighs.

DeepIntent's standing challenge ignores that UCL standing under § 17204 requires only an injury in fact and a loss of money or property, which Plaintiffs allege in the diminished, market-valued health data DeepIntent misappropriated and sold without compensation.

*Seventh*, Plaintiffs may pursue declaratory relief. DeepIntent's only challenge to Count VI is derivative of its attacks on the substantive claims, and it fails with them.

*Eighth*, Mr. Harris has sufficiently pled his individual claims. His visit to Ozempic.com—the manufacturer's website for a single prescription drug—itself reveals a condition-specific health interest, and the full-string URLs of his activity there were intercepted "contents" independent of any search term. That activity was compiled into DeepIntent's identity graph and corroborated by condition-naming advertisements he received within a day.

For these reasons, and as more fully set forth below, DeepIntent's Motion should be denied in its entirety.

## **FACTUAL BACKGROUND**

DeepIntent is a healthcare-focused demand-side platform ("DSP") that markets itself as capable of reaching "300 million patients based on different conditions or drugs they take." ¶86. Its core product is real-time behavioral surveillance of health-related internet users, which it sells to pharmaceutical and healthcare advertisers in the form of precision-targeted advertising audiences. ¶¶16–19, 64–65, 82. To build these audiences, DeepIntent embeds proprietary tracking software—including its "CDIUSER" persistent cookie, pixels and web beacons (the "Tracking Tools")—directly into the source code of several prominent health-related websites. ¶¶45, 51–53, 64. These tools activate the moment a user visits a partner website and are invisible to ordinary users. ¶¶49, 61, 64, 67.

The Complaint describes the technical operation of DeepIntent's Tracking Tools in detail. *See* ¶¶37–63. When a user visits a DeepIntent-integrated website, DeepIntent assigns the user a unique CDIUSER identifier (or recognizes an existing one) that persists on the user's device for over a year and continues to track the user even after opting out of cookies. ¶¶47–50, 61. DeepIntent simultaneously intercepts the full URL of each page visited, including the text of any search query appended to the URL, as the communication is transmitted in real time. ¶¶53–57.

Through a process called "cookie syncing," DeepIntent shares and reconciles its CDIUSER identifier with identifiers assigned to the same user by partner supply-side platforms, data brokers, and ad exchanges. ¶¶37–43, 59–60. This allows DeepIntent to track an individual across its entire partner network, including websites the user has never directly visited. ¶40. Critically, it also allows DeepIntent to re-identify users even after they delete their cookies, because the user's CDIUSER can be reconstructed from other synchronized identifiers. ¶41.

DeepIntent enriches this first-party tracking data with information from data brokers, including demographic data (age, gender, household income), lifestyle data, and ZIP-code-level location signals. ¶74. The end product is what DeepIntent calls an "industry-leading identity graph": a unified database linking persistent identifiers, mobile ad IDs, internet-connected television identifiers, IP addresses, and contextual and demographic data into a single, identifiable consumer profile. ¶75. DeepIntent then categorizes each individual into hundreds or thousands of health-condition-based "audiences" and sells access to those audiences to pharmaceutical and healthcare advertisers. ¶¶76, 82.

Plaintiff Nina Harris, a California resident, visited Healthline.com and ReachMD.com in 2023–2024 to research her own health condition and Ozempic.com to research the condition of her husband, Plaintiff Gerald Harris; Plaintiff Gerald Harris visited Ozempic.com in or around

2024 to research his own condition. ¶¶7–8. Each time Plaintiffs visited these websites, DeepIntent's Tracking Tools allegedly intercepted the URLs of pages visited, the text of search queries entered, and ad clicks, while simultaneously collecting device types, browsers, operating systems, IP addresses, and timestamps. ¶¶95, 102, 109. Plaintiffs did not consent to, and were entirely unaware of, DeepIntent's tracking, ¶113, and none of the visited websites' terms of service or privacy policies disclosed DeepIntent's identity graph or cross-device tracking. ¶¶96, 103, 110. Within as little as one day of their visits, Plaintiffs received targeted emails and advertisements naming the specific conditions they had researched. ¶¶97, 104, 111.

## ARGUMENT

### I. PLAINTIFFS HAVE ARTICLE III STANDING

Plaintiffs have established Article III standing, because they allege an injury in fact that is "concrete[,] particularized, and actual or imminent," "fairly traceable to the challenged action of the defendant," and "likely to be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

On a facial Rule 12(b)(1) motion, Plaintiffs have "no evidentiary burden," and the Court's task is "to determine whether the [Complaint] allege[s] facts that affirmatively and plausibly suggest that [Plaintiffs] ha[ve] standing to sue," accepting all material allegations as true and construing the pleading in Plaintiffs' favor. *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal citation and quotation marks omitted).

#### A. Plaintiffs Have Pleaded a Concrete Privacy Injury

DeepIntent's standing challenge rests on the false assertion that Plaintiffs have alleged only the collection of "generic searches" and IP addresses. *See* MTD 7–13. This characterization cannot be reconciled with Plaintiffs' allegations and should be rejected.

***Plaintiffs Allege Interception of Contents, Not Just Metadata.*** DeepIntent's Tracking Tools are alleged to have intercepted, among other things, the full URL of each webpage visited by Plaintiffs, including the verbatim text of search queries (*i.e.*, the words and phrases that users typed and communicated). ¶¶53–55. This is not merely metadata or IP addresses, but rather, the *contents* of Plaintiffs' communications. *See infra* Section II. These allegations thus go far beyond the allegations found insufficient in the cases DeepIntent cites. And courts have consistently recognized a privacy interest in online search queries because they directly reveal what the searcher is seeking to learn or do. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598–99, 603, 605 (9th Cir. 2020) ("*Facebook Tracking*") (holding that users retain reasonable expectation of privacy in full-string URLs on websites they visit, including "search terms inputted" that "divulge a user's personal interests [and] queries," and that the unauthorized collection of that activity is itself a concrete privacy injury).

***Plaintiffs Allege Re-Identification Through DeepIntent's Identity Graph.*** DeepIntent's argument that the intercepted data is not "personally identifiable information" ("PII") (MTD 7–8) ignores the core of Plaintiffs' theory: DeepIntent links persistent identifiers, mobile advertising IDs, IP addresses, and demographic data into a unified "identity graph," and advertises its ability to reach "300 million patients" based on their conditions or medications. ¶¶75, 86. Re-identification is not speculation; it is DeepIntent's advertised value proposition, and thus underscores why the cases DeepIntent cites have no bearing on this case.[2]

[2] Unlike the plaintiffs in *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1190 (N.D. Cal. 2020), and *In re USA Today Co., Inc. Internet Tracking Litig.*, 2026 WL 932655, at *2 (N.D. Cal. Apr. 6, 2026), Plaintiffs here alleged more than the collection of IP addresses or device types. *See infra* Section II.

*Maghoney v. Dotdash Meredith*, on which DeepIntent principally relies (MTD 11–12), is materially different. *See Maghoney v. Dotdash Meredith, Inc.*, 2026 WL 497402, at *4–5 (S.D. Cal. Feb. 23, 2026). There, the plaintiff alleged only that sensitive search terms were associated with "an IP address and other metadata," without allegations that the defendant used a persistent identifier, cookie syncing, data-broker enrichment, or an identity graph to resolve those searches to a unified individual profile. *Id.* Here, Plaintiffs allege that DeepIntent's CDIUSER identifier follows the same user across sites and sessions, is synchronized with partner identifiers, combined with demographic data, and used to create condition-specific audiences for pharmaceutical advertising. ¶¶41, 50, 59–60, 74–76, 82–86; *see D'Antonio v. Cable News Network, Inc.*, 2026 WL 960032, at *5–6 (S.D.N.Y. Apr. 9, 2026) (finding standing adequately alleged where cookie syncing, de-anonymization, and comprehensive profiles sold through real-time bidding were pleaded).

***Plaintiffs Allege Concrete Harm Through Targeted Advertising.*** An independently sufficient basis for standing is Plaintiffs' allegation that they actually received targeted health advertisements—tied to the specific conditions they searched for on websites with DeepIntent's Tracking Tools—as soon as one day after their website visits. ¶¶97, 104, 111. The causal chain is thus direct and unambiguous: DeepIntent embedded its tracking code on the websites Plaintiffs visited; that code intercepted Plaintiffs' communications and transmitted them to DeepIntent's servers; DeepIntent compiled the intercepted data into health profiles; and those health profiles were sold to pharmaceutical advertisers who then targeted Plaintiffs with health-related advertisements. ¶¶44–68, 82, 95–111. Notably, this receipt of targeted advertising tied to disclosed health information has been held sufficient to establish standing. *See, e.g.*, *C.M. v. MarinHealth Medical Grp., Inc.*, 2024 WL 217841, at *2 (N.D. Cal. Jan. 19, 2024) ("[P]laintiff

alleges that soon after visiting defendant's website he started to receive ads targeted to his medical conditions … [t]his allegation suffices for Article III standing."); *Gaige v. Exer Holding Co.*, 2025 WL 559719, at *2 (C.D. Cal. Mar. 2, 2025) (finding standing where plaintiff received targeted advertisements related to searches regarding health conditions on defendant's website).

DeepIntent's reliance on *Gabrielli v. Insider, Inc.* and *Xu v. Reuters News & Media Inc.* is misplaced. Both cases involved plaintiffs who alleged nothing more than the collection of an IP address—not the interception of the contents of their communications, and not the cross-site aggregation, re-identification, and targeted advertising that Plaintiffs allege here. *See Gabrielli*, 2025 WL 522515, at *4–5 (S.D.N.Y. Feb. 18, 2025) (dismissing where plaintiff alleged defendant captured nothing beyond an IP address that "cannot personally identify him" and did not reveal the content he accessed); *Xu*, 2025 WL 488501, at *1, *3 (S.D.N.Y. Feb. 13, 2025) (dismissing where the complaint alleged only IP-address collection, disclaimed any interception of communication content, and did not allege that the plaintiff received targeted advertising).

B. <u>Plaintiffs' Injuries Have Close Historical and Common-Law Analogs</u>

Under the Supreme Court's decision in *TransUnion LLC v. Ramirez*, a plaintiff's injury must have "a close historical or common law analogue," and qualifying intangible harms include "disclosure of private information" and "intrusion upon seclusion." 594 U.S. 413, 424–25 (2021).[3] Plaintiffs have adequately pleaded both.

Here, the Complaint alleges that DeepIntent intercepted and compiled Plaintiffs' private, sensitive health-related web activity into per-person profiles and disseminated that information—for profit—to pharmaceutical and other advertisers, enabling those third parties to "learn intimate

[3] Plaintiffs need only plead a harm bearing a "close relationship" to a traditionally recognized one; "[a]n exact duplicate in American history and tradition is not required[.]" *TransUnion*, 594 U.S. at 424–25.

details of their lives and target them for advertising purposes." ¶¶202, 212–13; *see also* ¶¶82, 140. Such "unauthorized accessing and monitoring of plaintiffs' web-browsing activity implicates harms similar to those associated with the common law tort of intrusion upon seclusion so as to satisfy the requirement of concreteness." *See Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 34 (2d Cir. 2017); *Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 865 (N.D. Cal. 2026) (allegations that defendant "compiled detailed user profiles by tracking plaintiffs' interactions across many websites, including sensitive browsing activity, without plaintiffs' knowledge or consent" adequately established a "highly offensive" intrusion of privacy sufficient to establish Article III standing); *Facebook Tracking*, 956 F.3d at 598.

Plaintiffs' allegations also map directly onto *TransUnion*'s endorsement of "disclosure of private information" as a traditional harm sufficient to confer standing. *See* 594 U.S. at 425; *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542 (2d Cir. 2024) (finding standing where plaintiff alleged his private information was disclosed to Facebook via a tracking pixel without his consent as "closely related to the public disclosure of private facts analog"); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 (N.D. Cal. 2023) (defendant's storage of browsing data with unique identifiers to send users personalized ads was sufficient to establish that the plaintiffs suffered concrete harm). And DeepIntent's claim that the intercepted data is "anonymous" because it allegedly lacks traditional PII fails for the reasons set forth in Section I.A. *See Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1087 (N.D. Cal. 2025) (rejecting "pseudonymization" argument). Moreover, to the extent Plaintiffs' standing depends on whether the information collected is personally identifiable, then "[r]esolution of the standing issue is intertwined with an element of the merits of [Plaintiffs'] claim" and is thus a question of fact

inappropriate for resolution at this juncture. *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *4 (N.D. Cal. Mar. 28, 2025) (internal citation and quotation marks omitted).

DeepIntent separately contends that the interception of health-related searches on "public" websites cannot, "as a matter of law," constitute a privacy injury, relying chiefly on *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018). MTD 11–12. That argument misreads both *Smith* and the governing standard. *Smith* was an unpublished, non-precedential decision[4] that affirmed dismissal on consent grounds, and the lone sentence DeepIntent quotes is drawn from the court's separate holding that browsing data is not "protected health information" under HIPAA—a statute that has no bearing on this case and that Plaintiffs do not invoke. *Id.* at 8–9.

Nor does DeepIntent's "anyone could have run the search" framing fit the Complaint (*see* MTD 12), which alleges aggregation of Plaintiffs' activity across multiple health-related sites and sessions into an individualized profile sold to advertisers. ¶¶68, 75–76, 117, 202. "[T]he aggregation of large quantities of data can itself constitute a violation of the reasonable expectation of privacy, even when individual data points might not otherwise be protectable." *Riganian*, 791 F. Supp. 3d at 1086. Whether DeepIntent's intrusion and aggregation would be offensive to a reasonable person, and whether Plaintiffs' searches reveal their health conditions rather than mere curiosity, are factual questions that cannot be resolved on the pleadings. *See infra* Section V.

C. Plaintiffs Have Independently Pleaded Economic Injury

Plaintiffs' standing rests on a further independent footing: DeepIntent's interception diminished the value of their personal health data, and economic harm—including lost or diminished property value—is a concrete injury. "Courts have accepted diminution in value as

[4] *See Smith*, 745 F. App'x at 1; 9th Cir. R. 36–3.

evidence of injury in fact." *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1229 (N.D. Cal. 2022).

To plead lost value, a plaintiff "must establish both the existence of a market for her personal information and an impairment of her ability to participate in that market." *Owens v. Smith, Gambrell & Russell Int'l, LLP*, 2024 WL 3914663, at *6 (C.D. Cal. May 30, 2024) (internal citations and quotation marks omitted). DeepIntent faults the Complaint for supposedly failing to allege (i) that the data had independent value to Plaintiffs, (ii) how that value was diminished, (iii) how DeepIntent's use harmed Plaintiffs, and (iv) that DeepIntent deprived Plaintiffs of value. MTD 14. The Complaint alleges all four.

*First*, Plaintiffs allege an identifiable market for their data: online advertising is a $200 billion industry, and entities like DeepIntent "routinely sell access to this type of information." ¶¶132–33. The Complaint identifies specific, priced products (*e.g.*, a dataset of hashed emails for $5,000 per month)—and alleges that health-related data is worth significantly more than standard personal data. *See* ¶¶134, 139; *see also* ¶137. That is precisely the kind of "stand-alone" market whose absence doomed the economic theory in *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019) (*"Facebook Consumer Priv."*) (cited at MTD 14).

*Second*, Plaintiffs allege how DeepIntent's conduct harmed Plaintiffs and deprived them of the value of their personal information. Against a consumer-facing market in which individuals are paid for the same data, DeepIntent sold Plaintiffs' data, thereby taking "something of value from Plaintiffs" and deriving benefit "without sharing the benefit of such value." ¶206(b); *see also* ¶140. Plaintiffs retain a cognizable stake in the profits DeepIntent unjustly derives from their data,

which "exists regardless of whether [Plaintiffs] planned to sell [their] data" and "whether a defendant's actions directly caused" the loss of value. *Facebook Tracking*, 956 F.3d at 599–600.

Here, the Complaint supplies precisely what DeepIntent's cited authorities found lacking[5]: value of the specific, sensitive health-related data DeepIntent took (¶¶134, 137, 139); a consumer market in which Plaintiffs could have realized that value (¶¶130, 135); and the non-consensual interception, collection, and resale of data that strips Plaintiffs of the control and exclusivity on which its value depends. ¶¶31, 206.

Precisely how much Plaintiffs' data is worth, and the exact amount by which DeepIntent's conduct diminished it, are merits questions, not threshold questions of standing. Plaintiffs' allegations of a concrete injury, in addition to the privacy analogs discussed above, are sufficient to establish Article III standing.[6]

## II. PLAINTIFFS HAVE STATED A CLAIM UNDER CIPA § 631

Plaintiffs have adequately alleged a claim under the second clause of CIPA § 631(a), which imposes liability on any person who, "without the consent of all parties to the communication," "reads, or attempts to read, or to learn the contents or meaning of any … communication while the same is in transit." Cal. Penal Code § 631(a). DeepIntent argues that Plaintiffs have not alleged

---

[5] *See Tash v. Vision Servs. Plan*, 2026 WL 1012680, at *5 (E.D. Cal. Apr. 14, 2026) (plaintiff did "not identify how the value of th[e] information ha[d] diminished because of Defendant's actions"); *Sisti v. Bosley, Inc.*, 2026 WL 1223927, at *3 (C.D. Cal. Apr. 27, 2026) (noting that defendant was alleged to only have disclosed "the fact" that plaintiff filled out a scheduling form—no communication contents or health information—plaintiff pled value only for "consumer data" generally, and plaintiff failed to allege actual harm).

[6] This economic injury also independently supplies the "lost money or property" required for Plaintiffs' UCL standing. *See infra* Section VI.

DeepIntent "read or learned" the contents of their communications while those communications were "in transit." *See* MTD 16–18.[7] As discussed below, DeepIntent is wrong.

As an initial matter, DeepIntent does not seriously dispute that it intercepts the "contents" of communications, *i.e.*, "any information concerning the substance, purport, or meaning" of a communication. *Brown*, 685 F. Supp. 3d at 935 (internal citation and quotation marks omitted). The Complaint alleges that DeepIntent's Tracking Tools intercept "the precise URL of each webpage visited by any user, as well as the exact search query input by that user," ¶54, and supports the allegation with screenshots showing transmission of full URLs and embedded search queries. ¶¶53–54; *see also* ¶¶51, 57–58.[8] These allegations establish that DeepIntent intercepted the "contents" of Plaintiffs' communications under CIPA (and the ECPA).[9] *See Facebook Tracking*, 956 F.3d at 605; *Selby v. Sovrn Holdings, Inc.*, 2025 WL 2950164, at *3 (N.D. Cal. Oct. 17, 2025); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

The Complaint also establishes that the interception of the communications described above occurs "in transit." Cal. Penal Code § 631(a). The pleading bar for this element is "not overly burdensome": allegations that communications are intercepted in real time through computer code suffice. *See Mata v. Zillow Grp., Inc.*, 2024 WL 5161955, at *6 (S.D. Cal. Dec. 18, 2024); *see also James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 962 (N.D. Cal. 2023). A

[7] The Court need not reach DeepIntent's argument that the first clause of CIPA § 631(a) does not apply because that provision provides multiple separate theories of recovery. *See In re Google Inc.*, 2013 WL 5423918, at *20 (N.D. Cal. Sept. 26, 2013). Because Plaintiffs have stated a claim under the second clause of § 631(a), as set forth below, their § 631(a) claim should proceed.

[8] Such URLs qualify as "contents" under CIPA even without recitation of the precise search terms, where, as here, the intercepted data is alleged to be "aggregated into comprehensive user profiles." *See Semien v. PubMatic Inc.*, 2026 WL 216333, at *9 (N.D. Cal. Jan. 27, 2026).

[9] The definition of "contents" is similar under both the CIPA and the ECPA. *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022).

contrary rule would force plaintiffs into "a one-sided guessing game" since the technical details of the interception lie uniquely within the defendant's possession. *D'Angelo v. Penny OpCo, LLC*, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023).

Here, Plaintiffs allege that, "[w]hen a user enters a search query, DeepIntent contemporaneously intercepts and transmits that data," so that "the user's communication with the website is intercepted while in transit." ¶55. Plaintiffs also describe the contemporaneous interception mechanism in detail: DeepIntent's Tracking Tools capture the user's search queries and URLs at the moment they are sent to the website—not from any later-stored record—and time-stamp each transmission to the precise second. ¶¶55–56; *see also* ¶157. That contemporaneous interception is intrinsic to DeepIntent's business: as a demand-side platform, it must evaluate the intercepted information in milliseconds to bid in real-time auctions for the right to serve a matching user a tailored advertisement, ¶¶22–26, 30, and it folds what it gleans into its identity graph, sorting users into custom audiences drawn from data aggregated across sites and sessions. ¶¶68, 75, 76, 117. Such profiling would be impossible without some "effort at understanding the substantive meaning" of the information intercepted. *R.C. v. Sussex Publishers*, *LLC*, 2025 WL 1735994, at *4 (N.D. Cal. June 23, 2025) (quoting *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025)). Comparable allegations have repeatedly been held sufficient at the pleading stage. *See, e.g.*, *Riganian*, 791 F. Supp. 3d at 1092 (sustaining § 631(a) claim where plaintiffs pled a "specific factual theory" that the defendant reads intercepted content "in real time" to update identity profiles); *Selby*, 2025 WL 2950164, at *3 (finding source-code screenshots adequately alleged interception "in transit"); *Semien*, 2026 WL 216333, at *8 (finding allegations

that a pixel "surreptitiously intercepts" URLs as the user communicates were sufficient to plausibly allege real-time interception).[10]

DeepIntent's remaining authorities do not support dismissal. Tellingly, both *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109 (N.D. Cal. 2025), and *Torres*, 2025 WL 1135088, were decided on summary judgment after development of a full evidentiary record. In addition, the former merely held that a third party's after-the-fact filtering and storage of data does not constitute "reading" communications under CIPA. *Doe*, 806 F. Supp. 3d at 1116–18. Likewise, in *Torres*, the Court found only that a vendor's reassembly of webform "events"—"done mechanically and without any attempt to decode its underlying meaning"—was not "reading." 2025 WL 1135088, at *5–6.[11] In stark contrast to those cases, the central allegation of the Complaint here is that DeepIntent "built an entire system capable of *reading[,] understanding … and categorizing* the substance of this [intercepted] user health data for the purpose of monetizing it." ¶158 (emphasis added).

Because Plaintiffs allege exactly that real-time reading and understanding of the contents of their communications, they have stated a claim under CIPA § 631(a).

[10] DeepIntent cites several session-replay and chatbot cases that are inapposite (MTD 16–17) because, in those cases, the alleged "interceptor" was merely performing a technical function on behalf of the website owner such as offering a chatbot, analytics, or site support. By contrast, DeepIntent is a separate ad-tech commercial entity that directly exploits the intercepted data for its own commercial purposes—far beyond any service it may provide to the host websites.

[11] Indeed, *Torres* contrasted such mechanical conduct with the conduct at issue in *Facebook Tracking*, where a third party "used plug-ins to track users' browsing histories, which it then used to create personal profiles that could be sold to advertisers"—conduct that "amounted to a violation under CIPA." *Torres*, 2025 WL 1135088, at *6.

## III. PLAINTIFFS HAVE STATED A CLAIM UNDER CIPA § 638.51

Plaintiffs have plausibly alleged that DeepIntent's Tracking Tools qualify as pen registers under CIPA § 638.51 because they are software "process[es]" that record addressing and signaling information transmitted by users' devices, including cookies, device identifiers, and related routing data. ¶¶47–50, 59–63, 167. These allegations fit squarely within the statutory text, which reaches any "device or process," and courts analyzing modern web trackers have recognized that § 638.50's definition of a pen register is not confined to telephones. *See, e.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023); *Mirmalek v. L.A. Times Commc'ns LLC*, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024)*; Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *3 (N.D. Cal. Oct. 9, 2025); *Semien*, 2026 WL 216333, at *10–11. Likewise, interpreting § 638.51 to encompass third-party tracking tools furthers CIPA's privacy-protective purpose, as California courts have instructed that CIPA be construed broadly to give "greater protection to privacy interests" and to apply its text to new technologies. *See Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016); *Shah v. Fandom Inc.*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024).

DeepIntent's arguments strip away its tracking architecture in order to mischaracterize Plaintiffs' claim as being solely tied to IP addresses. MTD 18–20. As noted above, IP addresses are not the only information at issue in this case. The Complaint alleges that, in addition to IP addresses, DeepIntent assigns users persistent identifying cookies such as a CDIUSER, syncs those identifiers across partners, captures device and browser information, and uses those identifiers to link a person's activity across websites and over time. ¶¶47–52, 59–63, 74–76, 167. This distinction matters because § 638.51 is concerned with addressing and signaling information broadly, not just IP addresses in isolation, and DeepIntent's use of persistent cookies, synced identifiers, and device-level routing data fits within the statute and distinguishes this case from

*Sanchez* and *Casillas*. *Sanchez v. Cars.com Inc*., 2025 WL 487194, at *2–4 (Cal. Super. Ct. Jan. 27, 2025); *Casillas v. Transitions Optical, Inc.*, 2024 WL 4873370, at *2–4 (Cal. Super. Ct. Sept. 9, 2024). DeepIntent's purpose-built health surveillance apparatus goes far beyond the IP-only retail-site decisions it cites.

*Gabrielli v. Insider, Inc.* does not compel dismissal, and other courts in this District have declined to extend its holding or adopt DeepIntent's interpretation of § 638.51. For example, in *D'Antonio v. Cable News Network, Inc.*, Judge Marrero surveyed more than a dozen § 638.51 tracking cases (including *Gabrielli v. Insider, Inc.*) and could "glean no determinative or dispositive factual circumstance or allegation warranting adherence to a specific line of cases," holding that, "given the allegations and the breadth of data alleged to have been tracked," the question raised factual issues "not suitable to be resolved on a motion to dismiss." 2026 WL 960032, at *5, 7 (S.D.N.Y. Apr. 9, 2026); *accord Garon v. Keleops USA, Inc.*, 2025 WL 2522374, at *6 (N.D. Cal. Sept. 2, 2025). DeepIntent's misguided attempt to recast its invasive tracking as an ordinary service-provider function is a merits dispute, not a pleading defect. *See* MTD 19–20.

DeepIntent's related standing argument (MTD 20) conflates the statutory authorization mechanism with the injury alleged. Plaintiffs do not claim injury because DeepIntent failed to obtain a court order; they allege that DeepIntent's software captured persistent identifiers and other addressing and signaling information, synchronized those identifiers across partners, de-anonymized users, and folded their activity into individualized health profiles. That invasion is substantive and bears a close relationship to traditionally recognized privacy harms. *See supra* Section I. *Gabrielli*, by contrast, involved materially narrower allegations. *See Gabrielli*, 2025 WL 522515, at *1 ("Gabrielli does not allege that the Tracker [sic] captured any information other than his IP address.").

## IV. PLAINTIFFS HAVE STATED A CLAIM UNDER THE ECPA

Plaintiffs have stated a claim under ECPA's wiretapping provision, 18 U.S.C. § 2511, because they plausibly allege that (1) DeepIntent intentionally intercepted, endeavored to intercept, or procured another person to intercept; (2) the contents of an electronic communication; (3) using a device; and (4) the interception occurred contemporaneously with the transmission. *See Tantaros v. Fox News Network, LLC*, 2018 WL 2731268, at *7 (S.D.N.Y. May 18, 2018). DeepIntent's three arguments regarding Plaintiffs' ECPA claim all fail. *See* MTD 20–23.

*First*, DeepIntent argues that the websites hosting its Tracking Tools consented to DeepIntent's receipt of users' data. MTD 21. This exception, however, operates only when "one of the parties to the communication has given prior consent." 18 U.S.C. § 2511(2)(d). DeepIntent was not a "party" to Plaintiffs' communications with these websites. *See Facebook Tracking*, 956 F.3d at 607–08 (rejecting argument that Facebook was a party to communications between users and third-party websites containing Facebook tracking code). And even assuming the partner websites could consent as parties, nothing in the Complaint or any material properly before the Court establishes that they knowingly consented to DeepIntent's receipt and use of full-string URLs, exact health-related search queries, and persistent cross-site identifiers used for identity resolution and profiling.

Moreover, "[c]onsent is not an all-or-nothing proposition," and a customer's general consent does not establish consent to the specific collection at issue. *See In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 192 (N.D. Cal. 2019) (internal citations and quotation marks omitted); *see also Brown*, 685 F. Supp. 3d at 933 (holding general consent to be insufficient where Google "has not proven that websites consented to the collection of users' private browsing data *in particular*"); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1078 (N.D. Cal. 2023)

(rejecting one-party consent where Meta could not show healthcare providers "actually consented" to sending sensitive health information). The Complaint alleges that neither the relevant policies nor any other disclosure informed users of DeepIntent's identity graph, cross-device tracking, or collection of full URLs and health-related queries. ¶¶96, 103, 110. Nothing properly before the Court establishes that the websites themselves specifically consented to that collection and use. At a minimum, the Court should allow the question of one-party consent to proceed because it represents a "triable issue" that should be resolved after the pleading stage. *See Brown*, 685 F. Supp. 3d at 933–34.

*Second*, DeepIntent cites a number of cases that all stand for the unremarkable proposition that ECPA's crime-tort exception requires Plaintiffs to plead an independent tortious purpose for the interception. *See* MTD 22. Plaintiffs meet that standard: they allege DeepIntent intercepted health-related communications to resolve pseudonymous users through data-broker and cross-device identifiers, enrich their profiles with demographic and connected-television data, link those profiles to prescription-claims information, and sell condition-specific audiences to advertisers. ¶¶68–76, 82–86, 189. Courts have held that associating intercepted data with preexisting identity profiles and preparing it for sale is a further, independently tortious use sufficient to trigger the exception. *Riganian*, 791 F. Supp. 3d at 1090–91; *see also Smith v. Rack Room Shoes, Inc.*, 2025 WL 2210002, at *4–5 (N.D. Cal. Aug. 4, 2025).

Finally, DeepIntent's argument that Plaintiffs have not adequately alleged that Defendant intercepted the contents of Plaintiffs' communications in real time (MTD 22–23) fails for the reasons set forth in Section II above. The Court should thus allow Plaintiffs' ECPA claim to proceed.

## V. PLAINTIFFS HAVE STATED CLAIMS FOR INTRUSION UPON SECLUSION AND VIOLATION OF THE CALIFORNIA CONSTITUTIONAL RIGHT TO PRIVACY

Courts analyze California constitutional privacy and intrusion-upon-seclusion claims together, asking "whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Facebook Tracking*, 956 F.3d at 601 (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)). Both inquiries are factually intensive, and thus courts are "generally hesitant to decide" at the pleading stage whether a reasonable expectation of privacy exists, *Gabrielli v. Motorola Mobility*, *LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025), or "how offensive or serious the privacy intrusion is." *Facebook Consumer Priv.*, 402 F. Supp. 3d at 797. Plaintiffs adequately allege both elements.

***Plaintiffs Adequately Allege A Reasonable Expectation Of Privacy.*** The reasonable-expectation inquiry turns on "the customs, practices, and circumstances surrounding a defendant's particular activities," *Facebook Tracking*, 956 F.3d at 602, and requires considering "the amount of data collected, the sensitivity of data collected, [and] the manner of data collection[.]" *In re Meta Android Priv. Litig.*, 2026 WL 1279416, at *6 (N.D. Cal. May 11, 2026).

As alleged in the Complaint, DeepIntent amassed a vast collection of data regarding the detailed web-browsing activities of users on numerous health-related websites. This information is sensitive both individually and in the aggregate, because it let DeepIntent build and enrich per-user identity-graph profiles that it then sold. *Cf. Doe*, 806 F. Supp. 3d at 1114 n.3 (cited at MTD 17) ("There may not be standing to sue based on a disclosure that a plaintiff was shopping for a football jersey, but there's standing to sue based on a disclosure that a plaintiff was likely shopping for eating disorder services."). DeepIntent's insistence that such data is not sensitive absent PII ignores that the combined information can be, and was, used to paint a detailed picture of users'

highly personal characteristics. *See, e.g.*, *Riganian*, 791 F. Supp. 3d at 1087 ("[T]racking of individuals' activity across thousands of websites, combined with extensive offline records … to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy"); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 942 (N.D. Cal. 2023) ("accumulation of a 'vast repository of personal data'" from sources including Plaintiffs' browsing activity and online communications "contravene[d] the reasonable expectation of privacy").

While DeepIntent argues that "the internet is not a place where users have a reasonable expectation of privacy" (MTD 23), that contention runs afoul of well-established precedent. *See Facebook Tracking*, 956 F.3d at 603–05; *see also Brown*, 685 F. Supp. 3d at 937 (rejecting defendant's argument that "courts have developed a presumption that users do not have an expectation of privacy over internet communications."). Indeed, DeepIntent's own authority notes there is no *per se* rule that "there can never be a reasonable expectation of privacy over internet activity," *Thomas v. Papa John's Int'l*, 2024 WL 2060140, at *2 (S.D. Cal. May 8, 2024) (cited at MTD 23), and courts reject any presumption to the contrary, *Brown*, 685 F. Supp. 3d at 937. Courts accordingly uphold intrusion-upon-seclusion claims based on the surreptitious interception, compilation, and sale of users' web activity through technologies like those alleged here. *See, e.g.*, *Krzyzek*, 817 F. Supp. 3d at 865.

***DeepIntent's Conduct Was Highly Offensive.*** "The ultimate question of whether [a defendant's] tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage." *Facebook Tracking*, 956 F.3d at 606; *see In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799 (N.D. Cal. 2022).[12] Thus, only if the

---

[12] Dismissal on this ground would be especially inappropriate here, where DeepIntent "[is] the only party privy to the true extent of the intrusion on Plaintiffs' privacy." *Hayden v. Retail Equation, Inc.*, 2022 WL 2254461, at *8 (C.D. Cal. May 4, 2022); *see also Riganian*, 791 F. Supp.

allegations "show no reasonable expectation of privacy or an insubstantial impact on privacy interests [can] the question of [a serious or highly offensive] invasion … be adjudicated as a matter of law." *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 40 (1994).

DeepIntent comes nowhere close to meeting this exacting standard. Plaintiffs allege that DeepIntent surreptitiously intercepts and "amass[es]" Plaintiffs' healthcare-related activities and choices "into profiles," then sells access so that third parties can "learn intimate details of their lives and target them for advertising purposes." ¶¶202, 212–13. That comprehensive profiling and data-selling "go well beyond the routine commercial behavior of collecting contact information for sending advertisements," and DeepIntent's secret implementation and monetization motive support the inference that the conduct was highly offensive. *See Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *2 (N.D. Cal. Jan. 6, 2026) (compiling "detailed profiles of each [p]laintiff's online web browsing activity tied to their email address and other personal identifiers" was highly offensive); *Selby*, 2025 WL 2950164, at *3 (same).

While DeepIntent claims that the "interception of public internet searches does not constitute conduct that is highly offensive," none of the authorities cited by DeepIntent stands for this sweeping proposition. *See* MTD 24; *see Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1080, 1088–89 (W.D. Wash. 2024) (dismissing intrusion claim under Washington law where the plaintiff "willfully shared her information with Defendant" healthcare provider through the defendant's own website); *Harrill v. Emanuel Med. Ctr.*, 2025 WL 1635428, at *7–8 (E.D. Cal. June 9, 2025) (plaintiff voluntarily provided information on defendant healthcare provider's website and did not plead that their information was disclosed by defendant); *Beltran v. Doctors*

3d at 1088 (degree of offensiveness of "alleged aggregation, synthesis, and sale of comprehensive online and offline data of individuals without their knowledge" could not be determined on the pleadings).

*Med. Ctr. of Modesto*, 2025 WL 1635467, at *7–8 (E.D. Cal. June 9, 2025) (same); *Wright v. TrueCare Prop. Holdings, LLC*, 2025 WL 3248749, at *4 (S.D. Cal. Nov. 21, 2025) (plaintiff alleged "only that she used Defendant's website, but not how she used it or what her visits revealed about her healthcare information."). In fact, *Cousin* cuts against DeepIntent: the court denied dismissal of plaintiffs' intrusion claim with respect to defendant's disclosure of plaintiffs' "sensitive health information," and the amended pleading in *Cousin II* survived precisely because the plaintiffs alleged their "medical conditions and statuses as patients were tracked … and transmitted" to a third party—the very pattern *Harrill*, *Beltran*, and *Nienaber* identify as sufficient. *See Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1126–27 (S.D. Cal. 2023); *Cousin v. Sharp Healthcare (Cousin II)*, 702 F. Supp. 3d 967, 973–74 (S.D. Cal. 2023).[13]

Here, Plaintiff Nina Harris alleges that she visited multiple consumer-health websites to research her own health conditions and, within a day, received targeted advertisements that "mentioned the specific health conditions that she had searched for"—strong corroboration that the intercepted data was both condition-specific and linked back to her as an individual, and not the sort of random information an "internet user might research … for reasons unrelated to the user's own health conditions." ¶¶97, 104; *Harrill*, 2025 WL 1635428, at *4. DeepIntent's persistent CDIUSER identifier then stitches those searches across multiple sites into a single profile sold to pharmaceutical advertisers for targeting. ¶¶51, 211–13. And unlike every authority DeepIntent invokes—each involving a plaintiff who voluntarily furnished certain, unspecified information to the defendant (*see supra* Section I.A)—DeepIntent is a third-party intermediary

[13] *See supra* Section I.A (distinguishing *Maghoney*). In *Popa v. Microsoft Corp*. (cited at MTD 9), the Court found a session-replay tool's capture of a plaintiff's "pet-store preferences and her street name" no more offensive than "a store clerk's observing shoppers," while expressly contrasting that to conduct that "could be offensive" because it involves "sensitive medical … information." 153 F.4th 784, 791 (9th Cir. 2025).

that surreptitiously compiled and monetized cross-site health-specific profiles of users (including Plaintiffs) who never knowingly interacted with DeepIntent at all. That is the *Facebook Tracking* fact pattern, on which the Ninth Circuit sustained these very claims. 956 F.3d at 603, 606.

## VI. PLAINTIFFS HAVE STATED A CLAIM UNDER CALIFORNIA'S UCL

The Complaint states a claim under both the UCL's "unlawful" and "unfair" prongs, and adequately alleges that Plaintiffs "suffered injury in fact" and "lost money or property" as a result of DeepIntent's conduct. Cal. Bus. & Prof. Code §§ 17200, 17204; *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 323 (2011) (economic injury exists where a plaintiff has "surrender[ed] … more, or acquired [something of lesser value] than he or she otherwise would have"). That economic injury—the diminished value of Plaintiffs' health data and their inability to monetize it in an existing market—is established by the same allegations that confer Article III standing. *See supra* Section I.C. Courts routinely sustain UCL claims of this kind. *See Toy v. Life Line Screening of Am., Ltd.*, 2024 WL 1701263, at *1–3 (N.D. Cal. Mar. 19, 2024) (sustaining UCL claim where plaintiff alleged defendant disclosed sensitive medical information through tracking tools without consent); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 846–47 (E.D. Cal. 2025) (same).

Plaintiffs satisfy the UCL's "unlawful" prong through predicate violations of CIPA §§ 631 and 638.51, the ECPA, Article I, § 1 of the California Constitution, and the common-law right against intrusion upon seclusion. *See* ¶¶232–233. Under the UCL, the unlawful prong "borrows" violations of other laws and makes them independently actionable, so if Plaintiffs plausibly plead at least one predicate violation, which they have, then the UCL claim survives on that basis alone. *See McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022, 1038–39 (N.D. Cal. 2019) ("[T]he Court finds plaintiffs' California privacy claims can go forward, and so the UCL 'unlawful' claim can also go forward on that basis."); *In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 973 (N.D. Cal.

2021) (noting that properly pled SCA claims, CIPA claims, intrusion upon seclusion claims, and claims under the California Constitution's right to privacy can each support the UCL's unlawful prong).

Plaintiffs have also stated a claim under the UCL's "unfair" prong because DeepIntent's practices cause substantial consumer injury that is not outweighed by any countervailing benefit and that consumers could not reasonably have avoided: the tracking was invisible and undisclosed. *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006); *see* ¶¶61, 64, 121–125, 234. DeepIntent's reliance on *Manier v. Triple Lift Inc.*, 2026 WL 1295546 (C.D. Cal. Apr. 15, 2026), *Archer v. United Rentals, Inc.*, 195 Cal. App. 4th 807 (2011), and *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613 (9th Cir. 2021), is unavailing (MTD 25) because each involved plaintiffs who failed to allege an established market in which their specific personal data could be traded.[14] Here, by contrast, Plaintiffs allege that their health data has independent market value, that an active market for it exists, and that DeepIntent extracted and sold that data without paying the market price. *See supra* Section I.C.

DeepIntent's remaining argument conflates UCL standing with competitive injury. MTD 25. But § 17204 requires only injury in fact and a loss of money or property—not antitrust-style harm to market rivals. Plaintiffs allege exactly that: DeepIntent misappropriated health-related data with independent market value, deprived Plaintiffs of the ability to control or monetize it themselves, and converted it into revenue through targeted advertising and profiling. ¶¶132–140,

[14] *See Manier*, 2026 WL 1295546, at *7 (no UCL claim where plaintiff's allegations showed that the personal information at issue had "no economic value to plaintiff"); *Archer*, 195 Cal. App. 4th at 816 (failing to allege market for PII at issue and basing UCL theory solely on "invasion of their right to privacy"); *Pruchnicki*, 845 F. App'x at 615 (plaintiff "failed to adequately allege that *her* personal information actually lost value.").

233–236. That is a loss of "money or property"; the UCL does not require a separate competitive injury.

## VII. PLAINTIFFS MAY PURSUE DECLARATORY RELIEF

Plaintiffs may pursue declaratory relief. DeepIntent's challenge to Count VI is entirely derivative of its challenges to Plaintiffs' substantive claims. MTD 26. Because Plaintiffs have adequately pleaded those claims, DeepIntent's asserted basis for dismissing Count VI fails as well.

## VIII. MR. HARRIS HAS ADEQUATELY PLEADED HIS CLAIMS

The only argument DeepIntent directs specifically at Mr. Harris is that he supposedly failed to plead what he searched with sufficient particularity—an objection it raises both as a challenge to his standing, MTD 10,[15] and as a challenge to the merits of his CIPA, ECPA, and privacy claims. *See* MTD 26–27. To the extent DeepIntent also folds Mr. Harris into the arguments it presses against all Plaintiffs, those fail as to him for the reasons already given. *See supra* Sections I.A (Article III injury), II (CIPA § 631(a)), IV (ECPA), and V (intrusion upon seclusion and invasion of privacy). The individualized objection fails as well, because Mr. Harris's claims are well-pleaded on any of three independent grounds.

*First*, Mr. Harris's visit to and activity on Ozempic.com reveals a condition-specific health interest independent of any particular search term. *See* ¶¶8, 107–09. Ozempic.com is a pharmaceutical manufacturer's website for a single prescription drug—Ozempic®, used to

[15] Because Plaintiff Nina Harris independently alleges Article III injury from the same course of conduct and asserts the same California Subclass claims for the same relief—having alleged, *inter alia*, searches concerning her own health condition on Healthline.com and ReachMD.com, followed within a day by targeted advertisements naming the very conditions she researched (¶¶7, 94–105)—the Court need not separately resolve Mr. Harris's standing at this stage to adjudicate those claims. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement."). In any event, if the Court were to find Mr. Harris's individual allegations insufficient, the appropriate course would be leave to amend, not dismissal. *See* Fed. R. Civ. P. 15(a).

manage Type 2 diabetes and for chronic weight management. ¶107. The visit to such a site itself signals a particularized interest in that medication and the conditions it treats, unlike a visit to a healthcare provider's website or portal, as was the case in *Beltran* and *Eisenhower*. *See Beltran*, 2025 WL 1635467, at *7–8; *B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056, 1067 (C.D. Cal. 2024).

*Second*, DeepIntent's lack-of-particularity theory fails because Mr. Harris's own activity on Ozempic.com establishes the "contents" of his intercepted communications, independent of any search run on his behalf. The Complaint alleges that each time Plaintiffs visited Ozempic.com, DeepIntent intercepted "the contents of their communications in the form of URLs, the text of searches and queries on specific topics, and ad clicks." ¶109; *see also* ¶¶8, 107–08. Full-string URLs of the pages a user visits are themselves "contents" under CIPA § 631(a) and the ECPA, and qualify as such even without recitation of the precise search terms, where, as here, the intercepted data is aggregated into comprehensive user profiles. *See Semien*, 2026 WL 216333, at *9 (sustaining § 631(a) claim on allegations that the defendant intercepted the "full-string URL of each page of the website" the plaintiffs visited, because such URLs reveal users' interests "particularly when aggregated into comprehensive user profiles"); *see also supra* Section II. Mr. Harris's allegations are therefore a far cry from the ones at issue in *Harrill* and *Lewis*, where the plaintiffs failed to identify the website or specific pages they accessed. Here, the Complaint identifies the specific site and alleges real-time capture of the URLs of Mr. Harris's activity there. *See Harrill*, 2025 WL 1635428, at *10; *Lewis v. Magnite, Inc.*, 2025 WL 3687546, at *12 (C.D. Cal. Dec. 4, 2025) (dismissing CIPA § 631 claim where the complaint merely alleged an "illustrative example" of a search and that the plaintiffs "used the search function of and/or

interacted with a website or mobile app" on which defendant's tracking technologies were installed); *see also* ¶¶8, 54, 107–09.

*Third*, the Complaint alleges that DeepIntent does not merely intercept isolated searches but aggregates intercepted data across multiple sites and sessions into a "comprehensive behavior profile on the user, focusing on healthcare interests and likely medical conditions," ¶68, unifying every identifier associated with a single person—including its persistent CDIUSER cookie—into "one profile" through its self-described "industry-leading identity graph," ¶¶75–76, and resolving each user's IP address to a household and ZIP code so that advertisers can target "specific households … and even individuals," ¶62.

The health information about Mr. Harris that feeds that profile is both sensitive and specific: his own visit to Ozempic.com, together with research conducted on his behalf into the side effects of Ozempic, its effect on the kidneys, kidney disease, and whether various medications are processed through the kidney or liver. ¶¶7–8. From the resulting profile, DeepIntent monetizes the inference—through its patented "Outcomes" platform and "script lift" measurement—that a member of Mr. Harris's household has a diabetes- or kidney-related condition. ¶¶84–86. And the Complaint alleges that, within a day, Mr. Harris received condition-naming targeted advertisements that corroborate the interception and re-identification. ¶111. In short, the substance of Mr. Harris's health-related web activity was not merely intercepted but compiled, inferred, and sold.

In sum, Plaintiffs' allegations supporting Mr. Harris's claims provide more than "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct," which is all that is required to survive a Rule 12(b)(6) motion to dismiss. *See Lynch v. City of New*

*York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Accordingly, DeepIntent's motion should be denied as to Mr. Harris.

## CONCLUSION

For the foregoing reasons, the Court should deny DeepIntent's Motion in its entirety.

Dated: New York, New York
July 17, 2026

*/s/ Adam M. Harris*
Adam M. Harris
Andrew Cauchi
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, New York 10004
Tel.: 212-350-8850
adam.harris@davidllc.com
andrew.cauchi@davidllc.com

Michael Acciavatti (*pro hac vice*)
**MILBERG, PLLC**
405 East 50th Street
New York, New York 10022
Tel.: 212-594-5300
macciavatti@milberg.com

*Attorneys for Plaintiffs Nina Harris, Gerald Harris, and the Classes*

## <u>CERTIFICATION</u>

The undersigned hereby certifies, pursuant to Local Civil Rule 7.1, that the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant DeepIntent Technologies, Inc.'s Motion to Dismiss contains 8,696 words, exclusive of the caption, table of authorities, table of contents, and signature block.

Dated: New York, New York
July 17, 2026

*<u>/s/ Adam M. Harris</u>*
Adam M. Harris

**<u>CERTIFICATE OF SERVICE</u>**

I, Adam M. Harris, hereby certify that a true and correct copy of the foregoing Plaintiffs' Opposition to Defendant DeepIntent Technologies, Inc.'s Motion to Dismiss was served on all counsel of record via the Court's CM/ECF filing system on this 17th day of July 2026.

*/s/ Adam M. Harris*
Adam M. Harris